**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CONOCOPHILLIPS COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **NORRIS,** | ) | |
| **DP MANUFACTURING, INC.,** | ) | |
| **TULSA WINCH, INC.,** | ) | |
| **RAMSEY WINCH, INC.,** | ) | |
| **AUTO CRANE COMPANY,** | ) | |
| | ) | |
| **Intervening Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 04-CV-820-TCK-SAJ** |
| | ) | |
| **C. BRAD HENRY, Governor of the State** | ) | |
| **of Oklahoma, W.A. DREW EDMONDSON,** | ) | |
| **Attorney General of the State of Oklahoma,** | ) | |
| **and Their Agents and Successors,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## OPINION AND ORDER

Before the Court are Defendants' Objections to Jurisdiction and Motion to Dismiss Temporary Restraining Order (Docs. 91 and 92); Plaintiff ConocoPhillips Company's Motion and Brief in Support of Request for Permanent Injunctive and Declaratory Relief (Doc. 93); and Intervenors Norris, DP Manufacturing, Inc., Tulsa Winch, Inc., Auto Crane Company, and Ramsey Winch, Inc.'s Motion and Brief in Support of Request for Permanent Injunctive and Declaratory Relief (Doc. 94). Also before the Court are briefs of *amici curiae*. *Amicus* briefs were filed on behalf of Plaintiffs by Securitas Security Services, USA ("Security Services"); Halliburton Energy

Services, Inc. ("Halliburton"); and the Oklahoma State Chamber of Commerce (the "State Chamber").[1]  *Amicus* briefs were filed on behalf of Defendants by the National Rifle Association ("NRA") and various Oklahoma citizens.[2]

I.    **Introduction**

At issue in this litigation are two Oklahoma laws that make it a crime for any "person, property owner, tenant, employer, or business entity to *maintain*, establish, *or enforce* any policy or rule that has the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked *motor* vehicle, *or from transporting and storing firearms locked in or locked to a motor vehicle* on any property set aside for any *motor* vehicle."  *See* OKLA. STAT. tit. 21, §§ 1289.7a; 1290.22(B).[3]  Generally, the challenged laws grant Oklahoma citizens the right to transport and store firearms in their locked vehicles on private property, even when a private property owner would like to prevent them from doing so.  These laws are referred to by their opponents as "forced entry" laws because they force a private property owner to allow entry of firearms onto their property.[4]  In contrast, they are referred to by their proponents as laws that

---

[1]  The State Chamber withdrew as *amicus*, but its brief was adopted by *amici* Society for Human Resource Management, ASIS International, HR Policy Association, and Equal Employment Advisory Council.

[2]  These Oklahoma citizens were denied the right to formally intervene, but their briefs were considered as *amicus* briefs in support of Defendants.

[3]  While this lawsuit was pending, Oklahoma Governor Brad Henry signed a bill into law that revised § 1289.7a but not § 1290.22(B).  The italicized language in the above quotation appears in § 1289.7a but not in § 1290.22(B).

[4]  *See, e.g.*, American Bar Association Special Committee on Gun Violence, *Report to the House of Delegates*, at 2 (February 2007), attached as Ex. D to ConocoPhillips' Add'l Br. on Preemption Issues [hereinafter ABA Report] (referring to Oklahoma laws at issue in this litigation as "forced entry" laws because they "seek to override the traditional right of a private property owner to exclude whomever he or she chooses from his or her property"); Brian J. Siebel of Brady

protect an individual's right to transport firearms.[5]  In this lawsuit, corporations with policies prohibiting firearms on company property have brought a pre-enforcement challenge to the laws pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, 28 U.S.C. § 2201, and the Supremacy Clause, arguing that the laws violate the U.S. and Oklahoma Constitutions and seeking declaratory and injunctive relief preventing their enforcement.  This Court is the first to address the constitutionality of these types of laws.[6]

### A.    Parties

Plaintiff ConocoPhillips Company ("ConocoPhillips") is a Delaware corporation "that operates buildings and facilities [in the Northern District of Oklahoma] that are held open to ConocoPhillips' employees, customers, vendors, and other visitors for the purpose of conducting company business."  (Compl. in Intervention ¶ 6.)[7]  In addition to the buildings themselves,

---

Center to Prevent Gun Violence, *Forced Entry: The National Rifle Association's Campaign to Force Businesses To Accept Guns at Work*, at iii (November 2005) [hereinafter Brady Center Article], available at http://www.bradycampaign.org/action/workplace ("The only way to combat this insanity is for American businesses and property owners to speak up and prevent Oklahoma-style laws – we are calling them 'forced entry-laws' throughout this report because they force property owners to accept guns on their property whether they want to or not . . . .").

[5]  *See, e.g.*, National Rifle Association Institute for Legislative Action, *Parking Lot Gun Laws and the Right to Transport Firearms* (February 2006), *available at* http://www.nraila.org/issues/FactSheets/Read (noting that all fifty states allow the transportation of firearms in motor vehicles for lawful purposes and that "[m]ore than one of every four of America's 65-80 million gun owners carries a firearm in his or her vehicle for protection").

[6]  Similar laws have been passed in Alaska, Kansas, Minnesota, and Kentucky.  Similar laws have been rejected in California, Utah, Texas, Montana, Missouri, Indiana, Florida, Georgia, New Hampshire, South Carolina, Alabama, Louisiana, and Indiana.  *See Guns at Work? An NRA Campaign Threatens Workplace Safety*, *available at* http://www.bradycampaign.org/action/workplace (providing map showing status of "Guns in the Workplace" bills in all fifty states).

[7]  Whirlpool Corporation ("Whirlpool") was the original Plaintiff.  On November 22, 2004, Whirlpool and Defendants filed a stipulation of dismissal of Whirlpool.  The parties agreed that

ConocoPhillips "owns and controls numerous parking lots in this district." (*Id.*) ConocoPhillips has a policy that prohibits possession of firearms on property owned or controlled by the company, including all parking facilities. (*Id.* ¶ 10.) The policy provides:

> The use or possession of contraband is prohibited on Company property. The use or possession of contraband is also prohibited with respect to employees, who, although not on Company property, are on Company business. For purposes of this policy, contraband includes, but is not limited to: Firearms, including shotguns, rifles, handguns (including those legally possessed) . . . or any other object, which in the judgment of the Company, may be considered a weapon or firearm, and for which no exceptions apply . . . .

(*Id.* at Ex. B.) ConocoPhillips alleges that, in response to the challenged laws, it has been forced to begin the process of changing its policies to avoid liability for non-compliance. (*Id.* ¶ 10.)

Intervening Plaintiffs Norris, a Dover Resources Company ("Norris"), DP Manufacturing, Inc. ("DP"), and Tulsa Winch, Inc. ("Tulsa Winch") are corporations with substantial business operations in Oklahoma. (Compl. of Norris, DP, and Tulsa Winch ¶¶ 11-16, Ex. B to Mot. to Intervene as Additional Pls.) These businesses, like ConocoPhillips, have established and enforced policies prohibiting employees from possessing weapons on company property, including parking lots. (*See id.* ¶¶ 17-18; *see also* Norris Policy, Ex. A to Mot. to Intervene as Additional Pls.) Intervening Plaintiffs Ramsey Winch, Inc. ("Ramsey Winch") and Auto Crane Company ("Auto Crane") are also employers that do business and own property in Oklahoma and that have policies prohibiting firearms on their business premises. (Compl. of Ramsey Winch and Auto Crane ¶ 8, attached as Ex. B to Mot. to Intervene as Add'l Pls.; *see also* Auto Crane Weapons Policy, attached

---

intervenors The Williams Companies, Inc. ("Williams") and ConocoPhillips would serve as Plaintiffs. On August 8, 2005, Plaintiffs and Defendants filed a stipulation of dismissal of Williams. Thus, ConocoPhillips is the only remaining Plaintiff.

as Ex. A. to Mot. to Intervene as Add'l Pls.)  Norris, DP, Tulsa Winch, Ramsey Winch, and Auto Crane are collectively referred to as Intervening Plaintiffs.[8]

Defendants are C. Brad Henry, Governor of the State of Oklahoma ("Governor Henry"), and W.A. Drew Edmondson, Attorney General of the State of Oklahoma ("Attorney General Edmondson") (collectively "Defendants").  Governor Henry is sued in his official capacity based on his duty to faithfully execute the laws of Oklahoma.  *See* OKLA. CONST. art. 6, § 8.  Attorney General Edmondson is sued in his official capacity based on his duty to prosecute and defend all actions and proceedings, civil and criminal, in which the State is an interested party.  *See* OKLA. STAT. tit. 74, § 18b.  (*See* ConocoPhillips Compl. in Intervention ¶¶ 3, 4.)

### B.    The OFA and OSDA

One of the challenged laws is contained in the Oklahoma Firearms Act of 1971, OKLA. STAT. tit. 21, § 1289.1 *et seq.* ("OFA").  The legislative findings supporting the OFA state that "[the OFA] is necessary for the safe and lawful use of firearms to curb and prevent crime wherein weapons are used by enacting legislation having the purpose of controlling the use of firearms, and of prevention of their use, without unnecessarily denying their lawful use in defense of life, home and property . . . including their use and transportation for lawful purposes."  OKLA. STAT. tit. 21, § 1289.2.[9]

The other challenged law is contained in the Oklahoma Self-Defense Act of 1995, OKLA. STAT. tit. 21, § 1290.1 *et seq.* ("OSDA").  The general purpose of the OSDA is to set forth

---

[8]  When the Court refers to "Plaintiff," it refers to ConocoPhillips.  When the Court refers to "Plaintiffs," it refers collectively to ConocoPhillips and all Intervening Plaintiffs.

[9]  In the OFA, "firearm" is not defined.  However, the terms "pistols," "rifles," and "shotguns" are defined.  *See* OKLA. STAT. tit. 21, §§ 1289.3, 1289.4, 1289.5.  These three terms appear throughout the OFA as the types of "firearms" regulated by the statute.  *See, e.g.*, OKLA. STAT. tit. 21, § 1289.6.

exceptions to the Oklahoma law prohibiting the carrying of "concealed handguns." *See* OKLA. STAT. tit. 21, § 1290.4.[10]   The OFA and OSDA are both contained in Title 21 of the Oklahoma Statutes, which is the criminal code.

### 1.    2004 Amendments to OFA and OSDA

On March 31, 2004, Governor Henry signed into law House Bill 2122, *see* H.B. 2122, 49th Leg., 2d Reg. Sess. (Okla. 2004), which added the following section to the OFA:

> PROHIBITING PERSONS FROM TRANSPORTING, STORING FIREARMS IN LOCKED VEHICLE UNLAWFUL
>
> No person, property owner, tenant, employer, or business entity shall be permitted to establish any policy or rule that has the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked vehicle on any property set aside for any vehicle.

OKLA. STAT. tit. 21, § 1289.7a (Supp. 2004) (amended 2005).  Section 1289.7a immediately follows Section 1289.7, which is entitled "Firearms in Motor Vehicles - Exceptions."  *See* OKLA. STAT. tit. 21, § 1289.7.  Section 1289.7 provides that any person except a convicted felon may transport in a motor vehicle an "open and unloaded" rifle, shotgun, or pistol.  *Id.*[11]

---

[10]   In the OSDA, a "concealed handgun" is defined as a "loaded or unloaded pistol carried hidden from the detection and view of another person either upon or about the person, in a purse or other container belonging to the person, or in a vehicle which is operated by the person or in which the person is riding as a passenger."  OKLA. STAT. tit. 21, § 1290.2.

[11]   "Open" means the firearm is "transported in plain view, in a case designed for carrying firearms, which case is wholly or partially visible, in a gun rack mounted in the vehicle, in an exterior locked compartment or a trunk of a vehicle."  *See* OKLA. STAT. tit. 21, § 1289.7. Section 1289.7 also provides that any person except a convicted felon may transport in a motor vehicle a rifle or shotgun concealed behind a seat of the vehicle or within the interior of the vehicle so long as it is not "clip, magazine, or chamber loaded."  *Id.*  According to another section of the OFA, a rifle or shotgun which is "clip or magazine loaded and not chamber loaded" may be transported "in an exterior locked compartment . . . or trunk" of a vehicle or "in the interior compartment of a vehicle."  *Id.* § 1289.13.

In addition to amending the OFA, House Bill 2122 also amended a provision of the OSDA entitled "Business Owner's Rights" by adding a new subsection (B).  *See* OKLA. STAT. tit. 21, § 1290.22(B).  Subsection (B) sets forth an "exception" to a property owner's general right to control the possession of weapons on his property.  Section 1290.22 provides:

> BUSINESS OWNER'S RIGHTS[12]
>
> A.      Except as provided in subsection B of this section, nothing contained in any provision of the Oklahoma Self-Defense Act, Section 1290.1 et seq. of this title, shall be construed to limit, restrict or prohibit in any manner the existing rights of any person, property owner, tenant, employer, or business entity to control the possession of weapons on any property owned or controlled by the person or business entity.
>
> B.      No person, property owner, tenant, employer, or business entity shall be permitted to establish any policy or rule that has the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked vehicle on any property set aside for any vehicle.

OKLA. STAT. tit. 21, § 1290.22 (Supp. 2004) (footnote added).  The relief originally sought in this lawsuit was to enjoin enforcement of the 2004 Amendments to the OFA and OSDA.

## 2.      2005 Amendments to OFA

On June 9, 2005, while this lawsuit was pending, Governor Henry signed into law House Bill 1243, *see* H.B. 1243, 50th Leg., 1st Reg. Sess. (Okla. 2005), which revised § 1289.7a.  These revisions provide:

> PROHIBITING PERSONS FROM TRANSPORTING, STORING FIREARMS IN LOCKED VEHICLE UNLAWFUL
>
> *A.*      No person, property owner, tenant, employer, or business entity shall *maintain*, establish, *or enforce* any policy or rule that has

---

[12]  Despite the title, § 1290.22 extends beyond the rights of "business owners" and also affects the rights of persons, property owners, tenants, and employers.

the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked *motor* vehicle, *or from transporting and storing firearms locked in or locked to a motor vehicle* on any property set aside for any motor vehicle.

*B.     No person, property owner, tenant, employer, or business entity shall be liable in any civil action for occurrences which result from the storing of firearms in a locked motor vehicle on any property set aside for any motor vehicle, unless the person, property owner, tenant, employer, or owner of the business commits a criminal act involving the use of the firearms.   The provisions of this subsection shall not apply to claims pursuant to the Workers' Compensation Act.*

*C.     An individual may bring a civil action to enforce this section. If a plaintiff prevails in a civil action related to the personnel manual against a person, property owner, tenant, employer or business for a violation of this section, the court shall award actual damages, enjoin further violations of this section, and award court costs and attorney fees to the prevailing plaintiff.*

*D.     As used in this section, "motor vehicle" means any automobile, truck, minivan, sports utility vehicle, motorcycle, motor scooter, and any other vehicle required to be registered under the Oklahoma Vehicle License and Registration Act.*

*Id.* § 1289.7a (Supp. 2005).[13]  According to Defendants, the 2005 revisions were passed, at least in part, to clarify portions of § 1289.7a that had been challenged during this litigation as unconstitutionally vague.  (*See* Defs.' Obj. to Jurisdiction and Mot. to Dismiss TRO 4-5.)  In addition, according to a report of the Oklahoma House of Representatives Media Division, the addition of subsection (B) to § 1289.7a was an attempt to "remove the liability concerns cited by businesses."  *See* Oklahoma House of Representatives Media Division, *Legislature Approves Gun Owner Protections* (May 27, 2005), *available at*

---

[13]  The italicized language is the language added by House Bill 1243.

htttp://www.lsb.state.ok.us/HOUSE/news7632.html.  The bill passed in 2005, amending § 1289.7a of the OFA, did not make any revisions to § 1290.22 of the OSDA.[14]

The Court will refer to all above-described amendments to the OFA and OSDA as the "Amendments."  Where necessary for clarification, the Court will refer to the amendments passed to both the OFA and OSDA in 2004 as the "2004 Amendments" and will refer to the revisions made to § 1289.7a of the OFA as the "2005 Amendments."  Collectively, the Amendments force Plaintiffs to allow employees and other guests to store and transport various types of unloaded and loaded firearms in their vehicles on Plaintiffs' private property.  The types of firearms that may be present in the vehicles, and whether they may be loaded are unloaded, depends on whether the individual has a concealed weapons license under the OSDA or is governed by the more general OFA.

### 3.    Events Leading to Original Drafting of the Amendments

An Oklahoma attorney named Lawrence A.G. Johnson ("Johnson") drafted § 1290.22(B) of the OSDA in recognition of the "continuous problem [that] arises relative to the conflict [that] law-abiding gun owners have regarding the exercise of their right to transport firearms to and from work and park in the employer's parking lot."  (Aff. of Author of Subject Statute ¶ 1.)  Johnson drafted this law and submitted it to the Oklahoma Legislature after several Oklahoma employees were discharged for keeping firearms in their vehicles on their employers' parking lots, in violation of those employers' policies.  (*Id.* ¶¶ 2-3.)[15]  According to Johnson, it was his intent to draft a "'public

---

[14]  If House Bill 1243 was passed to clarify problematic aspects of the challenged laws, it is unclear why the bill did not make identical changes to § 1290.22(B) of the OSDA.  Plaintiffs contend the 2005 revisions did nothing to cure the constitutional infirmities of the laws and in fact created increased confusion by making the two laws inconsistent.

[15]  Johnson represented these terminated employees in the case of *Bastible v. Weyerhauser Company*, 437 F.3d 999 (10th Cir. 2006), which was originally filed in the District Court for the
(continued...)

policy' statement [so] that discharges [based on transporting firearms in vehicles on company property] would be a termination in violation of public policy and not to draft a criminal statute." (*Id.* ¶ 3.)  Therefore, Johnson was the original drafter of the language that now appears in § 1290.22(B) and that first appeared in § 1289.7a, although § 1289.7a was revised in 2005 by the Oklahoma Legislature.[16]

## C.  Procedural History of the Litigation

On October 27, 2004, before the 2004 Amendments were to take effect, Whirlpool filed a Complaint and Motion for a Temporary Restraining Order and/or a Preliminary Injunction, seeking

---

[15](...continued)
Eastern District of Oklahoma.  In that case, the employees challenged the constitutionality of the pre-amendment version of § 1290.22 of the OSDA.  The plaintiffs argued that § 1290.22 violated their constitutional right to keep and bear arms set forth in Article 2, Section 26 of the Oklahoma Constitution.  *Id.* at 1001.  On February 13, 2006, while this lawsuit was pending, the Tenth Circuit concluded that the pre-amendment version of § 1290.22 of the OSDA was not in violation of the plaintiffs' constitutional rights because individuals in Oklahoma do not have "an unfettered right to transport and use firearms."  *See id.* at 1006.  Instead, the court held that such right is subject to reasonable regulations under the State's police power.  *Id.* (citing *State ex. rel. Okla. State Bureau of Investigation v. Warren*, 975 P.2d 900, 902 (Okla. 1998)).  The plaintiffs also argued that the Amendments at issue in this litigation retroactively applied to them and protected their right to have firearms in their vehicles on their employers' parking lots.  *Id.*  The Tenth Circuit held that the Amendments did not apply retroactively.  *See id.* at 1007.

In addition to challenging the constitutionality of the law, the plaintiffs also challenged their discharges as wrongful terminations in violation of public policy.  The Tenth Circuit held that the terminations did not violate public policy because "both the Oklahoma Constitution and the Oklahoma courts recognize that the right to bear arms is not unlimited, and, indeed, may be regulated."  *Id.* at 1008.  For a case presenting similar facts, see *Hansen v. America Online, Inc.*, 96 P.3d 950, 955 (Utah 2004), which held that terminations of employees for transporting firearms in vehicles did not violate public policy because the Utah legislature had "declined to give the right to keep and bear arms absolute preeminence over the right to regulate one's own private property."

[16]  The 2005 revisions were authored by Oklahoma State Representative Greg Piatt.  *See* Oklahoma House of Representatives Media Division, *Legislature Approves Gun Owner Protections* (May 27, 2005), *available at* http://www.lsb.state.ok.us/HOUSE/news7632.html.

to enjoin Defendants from enforcing the 2004 Amendments.  In its motion, Whirlpool argued the Amendments must be enjoined because they (1) deprived Whirlpool of its fundamental right to exclude individuals who possess firearms from its property; (2) were unconstitutionally vague, and (3) were in conflict with and preempted by the Occupational Health and Safety Act of 1970 ("OSH Act"), 29 U.S.C. §§ 651-678.  On October 29, 2004, Defendants filed a Special Appearance and Motion to Dismiss Complaint for Lack of Jurisdiction.  Defendants asserted Eleventh Amendment immunity and argued that the *Ex Parte Young* doctrine, which allows suit against government officials in certain circumstances, did not apply because Governor Henry and Attorney General Edmondson lacked a sufficient "enforcement connection" to the Amendments.

On October 29, 2004, the Honorable Sven Erik Holmes held a hearing on Whirlpool's motion.  As an initial matter, Judge Holmes denied Defendants' motion to dismiss, citing the case of *Craig v. Boren*, 429 U.S. 190 (1976), in which the Governor of the State of Oklahoma was the defendant in a challenge to the constitutionality of an Oklahoma statute.  (*See* TRO Hr'g Tr. 4, Oct. 29, 2004.)  Judge Holmes concluded that "the appropriate vehicle by which to challenge the constitutionality of a state statute is to name the chief law enforcement officer of the state, who is the governor, as well as to identify the attorney general."  (*Id.* 37.)

As to the constitutional challenge to the 2004 Amendments, Judge Holmes focused on Whirlpool's third argument related to conflict preemption.  However, Judge Holmes did not limit his discussion to whether the Amendments were preempted by the OSH Act.  Judge Holmes discussed conflict preemption in broader terms and raised the potentially preemptive effect of numerous federal laws.  (*See id.* 28-34; *see also* ConocoPhillips' Add'l Br. on Preemption Issues 3 ("At the hearing, the Court also raised the issue of conflict preemption, far more broadly than had Whirlpool, which had limited its arguments in that regard to the OSH Act's general duty clause.").)

11

For example, Judge Holmes raised the issue of whether the Amendments prevented an Oklahoma principal from prohibiting guns in a high school parking lot, in direct violation of the Federal Gun Free School Zones Act ("FGFSZA"), 18 U.S.C. § 922(q)(2)(A),  and Defendants conceded that the Amendments had such an effect.  (*See* TRO Hr'g Tr. 33, Oct. 29, 2004.)  At the conclusion of the hearing, Judge Holmes granted the TRO:

> [T]he Court finds that there is a clear basis, even in a cursory review of federal law, that would form the basis for conflict preemption. The United States Congress and agencies of the United States have duly enacted federal laws that clearly address the subject matter of this statute and do so with express prohibitions on how that statute – on whether and to what extent this statute could stand in the face of those prohibitions.

(*Id.* 34-35.)   Thus, Judge Holmes granted the TRO based on the Amendments' conflict with numerous federal laws and what he referred to as the doctrine of "complete preemption."  (*See id.* at 32 & 34.)  Judge Holmes then set a hearing regarding the issuance of a preliminary injunction and directed the parties "to prepare and submit what the parties believe to be an exhaustive and comprehensive statement of all of the federal, state, and local ordinances which may be impacted by a facial reading of this statute." (*Id.* 34-35.)  Judge Holmes ordered the parties to prepare a form of order memorializing the ruling, which was entered on November 3, 2004.  In this Order, Judge Holmes found that Whirlpool had a "substantial likelihood of prevailing on the merits regarding its arguments on conflict preemption and constitutional vagueness and overbreadth" and enjoined enforcement of the 2004 Amendments.  (*See* Order, Nov. 3, 2004.)

On November 4, 2004, Judge Holmes held a hearing to address preliminary injunctive relief. Judge Holmes first allowed Defendants to present arguments on their Supplemental Brief to Special Appearance and Motion to Dismiss Complaint for Lack of Jurisdiction, wherein Defendants again asserted sovereign immunity and raised, for the first time, improper venue in the Northern District

of Oklahoma.  (*See* Prelim. Inj. Hr'g Tr. 5-19, Nov. 4. 2004.)  At the conclusion of arguments, Judge

Holmes denied the motion to dismiss for lack of subject matter jurisdiction and denied the motion

to dismiss as to improper venue.  (*Id.* 23.)

As to the substantive constitutionality of the 2004 Amendments, Judge Holmes again focused

on the preemption challenge.  Judge Holmes concluded, based on the appendices of federal statutes

provided by the parties, that there existed "some 25 different federal laws that deal with firearms that

potentially are implicated by this." (*Id.* 32.)  Specifically, Judge Holmes observed that the 2004

Amendments would prohibit policies disallowing guns in the parking lots of federal facilities or

courthouses; in veterans affairs facilities; in Department of Interior ("DOI") facilities, including

DOI-funded Indian schools; and in explosives facilities, all in violation of federal law.  (*See id.* 30-

32.)  Counsel for Defendants did not deny the 2004 Amendments would have these effects and did

not wish to defend the constitutionality of the laws.  Instead, even after Judge Holmes' second denial

of their motion to dismiss based on sovereign immunity, Defendants wished to "stand on [their]

Eleventh Amendment argument." (*Id.* 34; *see also id.* 38.)  In order to allow Defendants time to

formulate their position on the constitutionality of the statutes, Judge Holmes did not issue a ruling

on the motion for preliminary injunction but instead extended the TRO.  (*Id.* 53-54.)

On November 5, 2004, Judge Holmes issued an Order directing Defendants to file a brief that

addressed the constitutionality of the 2004 Amendments.  In their brief filed November 9, 2004,

Defendants still refused to argue in support of the constitutionality of the 2004 Amendments.

Instead, they argued the 2004 Amendments were not criminal statutes and that there was no existing

immediacy to their enforcement.  Defendants then devoted twenty pages of its twenty-nine page

brief to re-arguing the sovereign immunity issue that Judge Holmes had rejected on two occasions.

By written Order on November 12, 2004, Judge Holmes ordered that the TRO entered on November

13

3, 2004 would be extended until the Court ruled on the motion for preliminary injunction. (*See* Order, Nov. 12, 2004.)   On November 19, 2004, Defendants filed a motion to dismiss the intervenors' complaint, again arguing improper venue and Eleventh Amendment immunity. (*See* Defs.' Mot. to Dismiss the Compl. in Intervention of Williams and ConocoPhillips.)

On November 23, 2004, Judge Holmes held a second hearing on the motion for a preliminary injunction.  Faced with statements by the Attorney General in the November 9, 2004 brief that the laws were not criminal in nature, Judge Holmes had concerns regarding Eleventh Amendment immunity.  Judge Holmes stated that, while there was Tenth Circuit authority holding that suit against the Attorney General was proper in challenges to criminal statutes,[17] the authority was less clear in relation to civil statutes. (*See* Prelim. Inj. Second Hr'g Tr. 12, Nov. 23, 2004.)  Judge Holmes also had concerns about proceeding in a manner that assumed the 2004 Amendments were criminal statutes in the face of a representation by the Attorney General that they were not. (*Id.* 15-16.)[18]  Judge Holmes concluded, and the parties agreed, that the classification of the 2004 Amendments as criminal or civil could potentially impact rulings on subject matter jurisdiction, venue, and vagueness.  The Court and the parties agreed to certify to the Oklahoma Court of Criminal Appeals ("OCCA") the question of whether the 2004 Amendments were criminal statutes and to stay all proceedings pending a ruling by the OCCA. (*See id.* 16-21.)  The parties agreed that the TRO would remain in place. (*Id.* 33-34.)

---

[17]  Judge Holmes referred to the case of *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987).

[18]  While Judge Holmes stated that deference should be afforded the Attorney General's interpretation of the law, Judge Holmes also noted the unique situation "where the opposing party gets to say what the law is as well as gets to litigate against you." (*Id.* 17-18.)

14

On March 16, 2005, the case was reassigned to the undersigned following Judge Holmes'

departure from the bench.  On March 28, 2005, the OCCA answered the certified question, finding

that the 2004 Amendments were criminal statutes.  Specifically, the OCCA held:

> The plain statutory language here prohibits enumerated entities from
> establishing particular policies affecting firearms.  That is, the plain
> language forbids an act.  This fits squarely within the statutory
> definition of crime and public offense.  The statutory provisions are
> found within the Penal Code--the section of the public laws
> specifying classes of persons capable of committing crimes and liable
> for punishment, defining the nature of crimes, and prescribing the
> kind and nature of punishments for each.  The statutory language
> does not itself impose a punishment for performance of the forbidden
> acts, so the general misdemeanor statute controls, and the offense is
> punishable as a misdemeanor.

*Whirlpool Corp. v. Henry*, 110 P.3d 83, 85 (Okla. Crim. App. 2005) (footnotes omitted).[19]   In light

of this ruling by the OCCA, the Court denied Defendants' pending Motion to Dismiss the Complaint

in Intervention of Williams and ConocoPhillips, which had been held in abeyance pending the

OCCA's ruling.  (*See* Order, April 8, 2005.)[20]

---

[19] Although the 2005 Amendments were not in existence at the time of this ruling, the Court
concludes that § 1289.7a remains a criminal statute.  The reasoning of the OCCA extends equally
to the 2005 Amendments to § 1289.7a.  The fact that the 2005 Amendments added a civil-
enforcement provision, s*ee* § 1289.7a(C) (Supp. 2005), in no way diminishes the criminal nature of
the law.  Such civil-enforcement provisions are common in Oklahoma criminal laws.  *See, e.g.*,
OKLA. STAT. tit. 21, §§ 684, 1075, 1230.10, 1627.1, 1731.1, 1955.

[20] In this Order, the Court incorporated Judge Holmes' prior Orders and oral rulings,
including relevant case law cited by Judge Holmes.  The OCCA's ruling that the Amendments were
criminal statutes only strengthened Judges Holmes' initial conclusion that Defendants did not enjoy
sovereign immunity from suit.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir.
2005) ("[A]n official who is charged with enforcing a state statute . . . is a proper defendant, so long
as the plaintiff shows an appreciable threat of injury.") (citing multiple cases wherein Attorney
General of state was properly sued in challenge to constitutionality of criminal statute); *Wilson v.
Stocker*, 819 F.2d 943, 946-47 (10th Cir. 1987) (holding, when criminal statute was at issue, that "a
plaintiff challenging the constitutionality of a state statute has a sufficiently legal adverse interest
to a state enforcement officer sued in his representative capacity to create a substantial controversy
(continued...)

After the OCCA's ruling, the Court established a briefing schedule to govern dispositive motions. Before these dispositive motions were due, the 2005 Amendments were passed. The motions currently before the Court address the constitutionality of both the 2004 and 2005 Amendments, and Plaintiffs request permanent injunctive relief preventing their enforcement. On August 18, 2005, the Court deemed moot the prior motions for preliminary injunctive relief, which were limited to the 2004 Amendments, and ordered that the injunction agreed to by the parties would remain in place until the Court ruled on the motions for permanent injunction. Thereafter, the Court ordered additional briefing on the issue of preemption. Specifically, the Court ordered additional briefing on (1) Plaintiff's and Intervening Plaintiffs' constitutional standing to make Supremacy Clause challenges that, if successful, would not redress their alleged injuries in fact, and (2) whether the Amendments impermissibly conflict with the OSH Act. The latter issue was initially raised by Whirlpool and Intervening Plaintiffs, but was not raised by remaining Plaintiff ConocoPhillips and was not briefed in the motions for permanent injunction. In the additional briefing submitted to the Court, ConocoPhillips argued in favor of OSH Act preemption and adopted the arguments and evidence originally submitted by Whirlpool. (*See* ConocoPhillips' Add'l Br. on Preemption Issue 2-3.)[21]

---

[20](...continued)
when . . . the plaintiff shows an appreciable threat of injury flowing directly from the statute").

[21] All Intervening Plaintiffs raised OSH Act preemption in their Complaints. (*See* Compl. of Norris, DP, and Tulsa Winch ¶¶ 29-30; Compl. of Ramsey Winch and Auto Crane ¶ 13.) OSH Act preemption was argued in the brief provided by the State Chamber, which was supported and adopted by *amicus* Society for Human Resource Management, ASIS International, Equal Employment Advisory Council, and HR Policy Association.

**D.      Plaintiffs' Claims and Court's Conclusions**

Plaintiffs offer three constitutional bases for their request for permanent declaratory and injunctive relief prohibiting enforcement of the Amendments.  (*See* Br. in Support of Request for Perm. Inj. and Declaratory Relief 7-18.)   First, Plaintiffs argue the Amendments result in an unconstitutional deprivation of private property interests.   Plaintiffs' argument related to their property rights takes two forms: (a) Plaintiffs allege an unconstitutional "taking" of private property in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution and Article 2, Section 24 of the Oklahoma Constitution ("Takings Clause challenge"); and (b) Plaintiffs allege an unconstitutional deprivation of their "fundamental right" to exclude others from private property, in violation of the substantive component of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and Article 2, Section 7 of the Oklahoma Constitution ("Substantive Due Process Clause challenge").   Second, Plaintiffs argue the Amendments are unconstitutionally vague, in violation of the procedural Due Process Clause of the Fourteenth Amendment of the U.S. Constitution ("vagueness challenge").[22]   Third, Plaintiffs argue the Amendments are preempted by various federal statutes in violation of the Supremacy Clause of the U.S. Constitution ("Supremacy Clause challenge").

The Court grants in part and denies in part the motions for permanent injunction.   In summary, the Court concludes:  (1) the Amendments do not result in an unconstitutional taking of Plaintiffs' private property rights or an unconstitutional deprivation of a "fundamental right"; (2)

---

[22] Plaintiffs declare that the Amendments are vague and  "overbroad."  However, Plaintiffs limit their arguments to vagueness of the Amendments, and the Tenth Circuit has held that overbreadth challenges are proper only in the First Amendment context. *See West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000).   Accordingly, the Court construes this challenge as being limited to the vagueness of the Amendments.

Plaintiffs lack standing to assert a facial vagueness challenge; and (3) the Amendments are preempted as in conflict with the OSH Act.  The Court enjoins enforcement of the challenged laws against Plaintiffs and all employers subject to the OSH Act.

## II.     Standing

The Court has not addressed the issue of standing in prior written Orders or at prior hearings.[23]  The Court has an obligation to determine whether Plaintiffs have standing to pursue their claims before addressing the merits of Plaintiffs' constitutional claims.  *See Robey v. Shapiro, Marianos & Cejda, LLC*, 434 F.3d 1208, 1211 (10th Cir. 2006) (explaining that district courts must address standing and other matters pertaining to subject matter jurisdiction before proceeding to merits of claim); *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005) ("Because it involves the court's power to entertain the suit, constitutional standing is a threshold issue in every case before a federal court.").

"Article III, Section 2 of the United States Constitution extends the judicial power only to 'Cases' or 'Controversies.'  A dispute is an Article III 'Case' or 'Controversy' only if the plaintiff can establish what is known as 'constitutional standing.'" *Robey*, 434 F.3d at 1210 (quotation omitted).  "The constitutional requirements for standing to challenge a state statute in federal court are threefold: (1) an injury in fact, (2) a causal connection between the injury and the challenged act, and (3) a likelihood that the injury will be redressed by a favorable decision." *Aid for Women v. Foulston*, 441 F.3d 1101, 1109 (10th Cir. 2006) (quotation omitted).  In addition to constitutional standing, Plaintiffs must satisfy three "prudential" standing principles:  "(1) [Plaintiffs] generally

_____

[23]  Defendants focused their jurisdictional arguments on the issue of sovereign immunity.  Judge Holmes and this Court previously rejected all arguments that Defendants enjoyed sovereign immunity from suit, and the Court finds no need to offer further explanation for these conclusions.  *See supra* note 20 and accompanying text.

must assert [their] own legal rights; (2) the court must refrain from adjudicating generalized grievances most appropriately addressed by one of the other branches of government; and (3) [Plaintiffs'] complaint must fall within the zone of interests to be protected or regulated by the statute . . . in question." *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1137 (10th Cir. 2006) (quotations omitted).  Plaintiffs bear the burden of establishing constitutional and prudential standing.  *Foulston*, 441 F.3d at 1109.

Plaintiffs have not been prosecuted for violation of the Amendments and are therefore making a pre-enforcement challenge.  When faced with an allegedly unconstitutional criminal statute, "a plaintiff need not suffer an actual arrest or prosecution to establish a case or controversy." *Foulston*, 441 F.3d at 1110.  However, "[t]he mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006).  Instead, when prospective relief against enforcement is sought, a plaintiff must show "an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences flowing from the statute's enforcement." *Id.* (quotation omitted).

As an initial matter, the Court finds that Plaintiffs face a credible threat of prosecution.  The Amendments prohibit policies that Plaintiffs currently have in place and that Plaintiffs actively desire to enforce.  Therefore, this is not a case in which Plaintiffs may or may not choose to violate the law at some point in the future.  *See Winsness*, 433 F.3d at 736 (finding that a plaintiff lacked constitutional standing because he had "alleged neither an intent nor a desire to violate the flag-abuse statute in the future").  In addition, Plaintiffs have no reason to believe or assume the Amendments will not be enforced against them.  *See Winsness*, 433 F.3d at 732-33 (10th Cir. 2006)

19

(finding that a plaintiff's prosecution for violation of Utah's flag-abuse statute was too speculative where district attorney filed affidavit promising non-prosecution and U.S. Supreme Court had invalidated similar flag-abuse statute in another state).  Unlike the flag-abuse statute at issue in *Winsness*, the constitutionality of the Amendments or similar laws has not been addressed by any court and certainly has not been addressed by the U.S. Supreme Court.  Nor is there any sworn promise of non-prosecution in the event this Court's injunction is lifted.[24]  In this Court's view, it would be illogical to find that Defendants – who are charged with enforcing and prosecuting the laws of Oklahoma – have no intention to enforce a criminal law that has not been declared unconstitutional or otherwise infirm.  Therefore, the Court finds Plaintiffs face a "credible threat of prosecution" as one consequence flowing from the Amendments.

In addition to the general threat of prosecution, Plaintiffs allege three specific "other consequences" flowing from the Amendments' prohibitions of their policies: "(1) impermissible interference . . . with [their] constitutionally protected property rights; (2) the clear and imminent potential for criminal liability arising from the enforcement of the constitutionally vague and overbroad Amendments, and (3) the consequences of [their] inability to comply with federal statutes which conflict with and have supremacy over the Amendments."  (ConocoPhillips' Add'l Br. on Preemption Issues 7.)  The Court will address each of these "other consequences" to determine if they constitute injuries in fact.  The Court will also address whether Plaintiffs can meet the other two standing requirements for each of their specific claims for declaratory relief.  *See DaimlerChrysler*

---

[24]  In early briefing, Defendants argued they lacked an "enforcement connection" to the Amendments.  However, at that time, Defendants were arguing the Amendments were civil statutes.  (*See, e.g.*, Br. on Behalf of Gov. and AG of Okla.)  Regardless, a legal argument that Defendants lack an enforcement connection is distinguishable from an affidavit promising non-prosecution of the relevant criminal law.

*Corp. v. Cuno*, 547 U.S. __, __, 126 S. Ct. 1854, 1867 (2006) (stating that "the [Supreme] Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press") (quotation omitted); *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

A.     **Injury to Property Rights - Takings Clause Challenge and Substantive Due Process Clause Challenge**

An injury in fact is an "invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Gandy*, 416 F.3d at 1154. Plaintiffs have alleged injury to their right to exclude others from private property, which they allege to be legally protected by the Takings Clause and the Substantive Due Process Clause. This alleged injury to Plaintiffs' property rights is concrete and particularized because, were the Amendments to be enforced, Plaintiffs' right to exclude would be impaired to the extent Plaintiffs desire to exclude those carrying firearms in vehicles onto their private property. Further, the injury is not purely conjectural. Plaintiffs have policies excluding such individuals from their property, making it clear they actively exercise their right to exclude this segment of the population.

To establish causation, a plaintiff must show the "injury is fairly traceable to the challenged action and is not the result of the independent action of some third party not before the court." *Id.* at 1156 (quotation omitted). Prior to enactment of the Amendments, Plaintiffs maintained their policies with no threat of criminal prosecution or injury to their property rights. Upon passage of the Amendments, Plaintiffs began the process of revising their policies and sought relief in this Court. The Amendments are the direct cause of the alleged injury to Plaintiffs' property rights.

The "redressability" element requires that a "plaintiff demonstrate a substantial likelihood that the relief requested will redress its injury in fact." *Id.* at 1158. A plaintiff must "show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every

21

injury." *Id.* If the Court were to declare that the Amendments result in an unconstitutional taking of Plaintiffs' private property without just compensation or that the Amendments violate Plaintiffs' substantive due process rights, their alleged injuries would be redressed. Specifically, Plaintiffs would be allowed to maintain their policies, exclude those carrying firearms in vehicles, and avoid the threat of prosecution. At the very least, Plaintiffs would receive a declaration they were entitled to some form of compensation for the deprivation of their property interests. Accordingly, Plaintiffs have standing to assert the Takings Clause and Substantive Due Process Clause challenges.[25]

The Court must also consider prudential standing requirements, which require Plaintiffs to assert their "own legal rights" and to show that the controversy is not a "generalized grievance." *See Utah Shared Access Alliance*, 463 F.3d at 1137. Under both the Takings Clause and Substantive Due Process Clause, Plaintiffs make arguments regarding the rights of property owners that are not before the Court. (*See* Br. in Support of Request for Perm. Inj. and Declaratory Relief 7-8 (arguing that the Amendments "deprive Plaintiffs and other Oklahoma property owners of their fundamental rights of property ownership without compensation" and that the Amendments are "harmful to the rights of all Oklahoma property owners").) The Court finds that Plaintiffs lack prudential standing to assert a Takings Clause challenge on behalf of all Oklahoma property owners because the Court's adjudication of other property owners' rights would be based on purely hypothetical arguments. The Court is not aware of any Takings Clause case in which a court invalidated a law based on its impact on property owners that were not parties to the litigation. Even the *per se* takings cases relied upon by Plaintiffs, which are explained *infra* Part III, are tied to the challenged law's alleged impact on

---

[25] *Infra* Part III.A, the Court addresses the "ripeness" of Plaintiffs' Takings Clause challenge. To the extent this ripeness analysis overlaps with standing, it is incorporated herein by reference.

the challenger's particular piece of property.  The Amendments' precise effect on an individual's property rights differ depending on how that individual chooses to exercise his or her right to exclude.  Accordingly, the Court limits its Takings Clause analysis to whether the Amendments result in a taking of *these Plaintiffs*' property interests.

With respect to the Substantive Due Process Clause challenge, the Court's analysis is the same regardless of whose property is at issue.  If the Amendments impair a fundamental right without being narrowly tailored to meet their objectives, the Amendments must be declared unconstitutional as to all Oklahoma property owners, including Plaintiffs.  Plaintiffs have therefore met the requirements of prudential standing to make the Substantive Due Process Clause challenge as it is framed in their brief.

### B.       Injury to Right to "Fair Notice" - Vagueness Challenge

Plaintiffs have also alleged injury to their right to receive fair notice of what conduct is criminalized by the Amendments, which is protected by the procedural component of the Due Process Clause.  Plaintiffs challenge three aspects of the Amendments as unconstitutionally vague: (1) discerning what policies will "have the effect" of prohibiting the activities the Amendments seek to allow; (2) discerning what is considered "property set aside for any vehicle" or "property set aside for any motor vehicle"; and (3) discerning what qualifies as a "locked vehicle" or a "locked motor vehicle."  (*See* Br. in Support of Request for Perm. Inj. and Declaratory Relief 14-17.)

Because the Amendments have not been enforced, Plaintiffs' vagueness challenge is a facial challenge.  In two recent cases, the Tenth Circuit addressed the constitutional standing requirements for a plaintiff bringing a facial vagueness challenge.  In both cases, the Tenth Circuit found that an injury in fact existed based on the plaintiff's lack of notice regarding whether his desired conduct

was or was not covered by the statute.[26]  In *Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006), there were conflicting Attorney General opinions interpreting the challenged statute in two different ways.  The court found these "conflicting interpretations of the reporting statute and the uncertainty as to what conduct will lead to prosecution did potentially deprive *[p]laintiffs* of fair notice." *Id.* at 1110 (emphasis added).  In *Doctor Johns, Incorporated v. City of Roy*, 465 F.3d 1150 (10th Cir. 2006), the plaintiff company believed that it did not fall under the definition of a "sexually oriented business."  The court found an injury because the plaintiff could show he would suffer harm if he did or did not follow his interpretation of the statute.  *Id.* at 1156.  In both cases, there was ambiguity as to whether the plaintiff's desired conduct was actually covered by the challenged statute.

In contrast, in this case, Plaintiffs' desired conduct – maintaining their current policies and altogether excluding firearms from their property – is clearly prohibited by the Amendments. Plaintiffs raise three potentially vague aspects of the Amendments but fail to show that these ambiguities impair their right to receive fair notice of whether their desired policies are prohibited.

---

[26]  Facial vagueness challenges are also proper if the challenged law threatens to chill "constitutionally protected conduct." *See United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988).  However, the Amendments do not threaten any such conduct.  In the only case found addressing whether the exercise of property rights is considered "constitutionally protected conduct" for purposes of a facial vagueness analysis, the court rejected the argument.  *See Sweet Home Chapter of Cmtys. for a Great Oregon v. Lujan*, 806 F. Supp. 279, 285 (D.D.C. 1992) ("The Court agrees with plaintiffs that [the challenged law] implicates private property rights protected under the Fifth Amendment.  It cannot, however, conclude that such Fifth Amendment interests constitute 'constitutionally protected conduct' [for purposes of a vagueness analysis]."), *rev'd on other grounds*, 515 U.S. 687 (1995).  Case law in this circuit indicates that facial vagueness challenges based on a threat to "constitutionally protected conduct" are proper only in the context of threats to First Amendment rights, *see Gaudreau*, 860 F.2d at 360; *Z.J. Gifts D-4*, 311 F.3d at 1227, or certain "fundamental rights" such as the right to privacy, *see Aid for Women v. Foulston*, 327 F. Supp. 2d 1273, 1282-83 (D. Kan. 2004).  For reasons explained *infra* Part IV, the Court concludes that the right to exclude others from private property is not a "fundamental right."

Plaintiffs' first vagueness challenge relates to discerning what types of policies "have the effect of" prohibiting the conduct the Amendments seek to allow. (*See* Br. in Support of Request for Perm. Inj. and Declaratory Relief 16 (arguing that the "[t]he general public cannot discern what policies will 'have the effect' of prohibiting such activities"). These particular Plaintiffs, however, cannot be confused as to whether their own policies "have the effect of" prohibiting what the Amendments seek to allow – firearms in vehicles on their private property. All Plaintiffs have policies that prohibit unauthorized firearms *anywhere* on company property. The Amendments were passed in direct response to the enforcement of corporate policies like Plaintiffs' against employees transporting firearms in their vehicles on company property. *See generally Bastible v. Weyerhauser Co.*, 437 F.3d 999 (10th Cir. 2006). While there might be vagueness problems in applying this language to other individuals or other types of policies, *e.g.,* – whether an individual's informal "household rule" that she will not allow firearms on her property qualifies as a "policy" that "has the effect of" violating the Amendments – there can be no question that the Amendments prohibit the policies before the Court.

Plaintiffs' second vagueness challenge relates to the phrases "property set aside for any vehicle" and "property set aside for any motor vehicle." Plaintiffs argue that these phrases potentially prohibit firearms in areas other than parking lots, such as internal roads within a corporate complex or areas inside the corporate facility that are traversed by forklifts, tractors, and other motorized equipment. However, Plaintiffs' current policies prohibit employees or visitors from having unauthorized firearms anywhere on their property. Thus, whether the phrase "property set aside for any motor vehicle" means only parking lots or extends to other internal corporate roads mentioned by Plaintiffs, the phrase still unambiguously criminalizes Plaintiffs' current policies. Again, although problems could arise with application of this phrase to others.

25

The third vagueness challenge relates to the problems caused by the phrases "locked vehicle" and "locked motor vehicle." Plaintiffs' concern is that a firearm may technically be in a "locked" vehicle but still easily accessible because that vehicle is an open-air Jeep or convertible. Again, Plaintiffs' policies, as they currently exist, disallow unauthorized firearms everywhere on company property and therefore disallow the firearms whether or not they are in a locked, unlocked, exposed, or unexposed vehicle. Thus, Plaintiffs' desired conduct would not be impacted by resolution of ambiguities in the phrase "locked vehicle."

Plaintiffs cannot show that the three allegedly vague aspects of the statute have prevented them from knowing whether their desired actions violate the Amendments. Instead, these particular Plaintiffs are on notice that the precise conduct in which they wish to engage – maintaining the policies in the record before the Court – is criminalized by the Amendments. In this situation, Plaintiffs do not have standing to challenge the laws as unconstitutionally vague. *See Z.J. Gifts D-4, L.L.C. v. City of Littlejohn*, 311 F.3d 1220, 1226 (10th Cir. 2002) (stating that, outside the context of challenged laws that impact First Amendment expression, "[s]tanding usually requires that the plaintiff assert an injury to himself, rather than injuries to third parties not before the court"), *rev'd on other grounds*, 541 U.S. 774 (2004) ; *see also United States v. Day*, 223 F.3d 1225, 1228 (10th Cir. 2000) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 n.6 (6th Cir. 1995) (noting that, in a case that does not involve First Amendment

freedoms, a plaintiff "has standing to raise a vagueness challenge only insofar as the statute is vague as applied to their conduct").[27]

To be clear, the Court has significant concerns regarding the Amendments' reach to "policies" enforced by individual property owners regarding firearms near their homes, the Amendments' lack of clarity in informing Oklahoma citizens of exactly what conduct is criminalized, and the potential for arbitrary enforcement of the Amendments. However, this Court must be satisfied that the record before it presents a justiciable controversy, and the Court concludes that these are not the proper plaintiffs to make a facial vagueness challenge.

## C.    Injury to Compliance with Federal Law - Supremacy Clause Challenge

In the additional briefing ordered by the Court, Plaintiff clarified its Supremacy Clause argument. Plaintiffs' position is that the Amendments must be wholly invalidated based on the sheer number of conflicts the Amendments create with federal law:  "ConocoPhillips believes that the numerous conflicting federal statutes create an untenable situation in Oklahoma with regard to the Amendments. . . . The significant degree of conflict preemption would suggest the total invalidation of the Amendments is appropriate." (*See* ConocoPhillips' Add'l Br. on Preemption Issues 7-8.) The allegedly conflicting federal statutes and regulations include, but are not limited to, the OSH Act; the FGFSZA, a specific provision the Brady Handgun Violence Prevention Act ("Brady Act") contained at 18 U.S.C. § 922(g); and 39 C.F.R. § 232.1 (prohibiting possession of firearms on postal

---

[27] Plaintiffs also lack "prudential standing" to assert their facial vagueness challenge because Plaintiffs cannot show the Amendments "might be unconstitutional as applied" to their conduct. *See Doctor Johns, Inc.*, 465 F.3d at 1157 (finding that "prudential standing" existed for purposes of a facial vagueness challenge because the company had shown that the challenged law "might be unconstitutional as applied" to them).  Whether couched as a lack of constitutional or prudential standing, these Plaintiffs may not bring a facial vagueness challenge to the Amendments because their desired conduct, as pled, is clearly in violation of the Amendments.

property).[28]   Plaintiffs argue they have standing to make their Supremacy Clause challenge based on the collective number of conflicts with federal law, without regard to whether Plaintiffs are impacted by the allegedly preemptive federal law.

Although the Amendments are likely in conflict with several federal laws,[29] the Court is aware of no legal doctrine authorizing total invalidation of a state law based on the number of conflicts it creates with various federal laws.  Plaintiffs cited no legal authority for this position, and the Court was unable to locate any such authority.[30]  In addition, Plaintiffs cited no standard setting

---

[28]  *Amicus* Halliburton argues the Amendments are preempted by the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*, and the Safe Explosives Act, 18 U.S.C. § 841 *et seq.*  Halliburton, which uses nuclear material and industrial explosives in its oil and gas operations, argues that "nuclear materials . . . can be extremely dangerous and sought after by terrorist groups" and that "allowing unregulated possession of weapons in the vicinity of highly regulated materials results in a risk structure that is untenable."  (Br. of Halliburton as *Amicus Curiae* 6.)  Although these are significant concerns, the Court declines to address the preemptive effect of statutes raised solely by *amicus*.  *See* 4 Am. Jur. 2d *Amicus Curiae* § 7 (1995) ("[C]ourts generally refuse to consider issues as to the interpretation or constitutionality of a statutory provision unless such issues are also raised by, or joined in by, a party to the action.").

[29]  For example, the Amendments are likely in direct conflict with the Brady Act (prohibiting nine specific categories of persons from ever possessing firearms, only one of which is excepted from the Amendments); 39 C.F.R. § 232.1 (prohibiting carrying or storing of firearms on postal property, which is not excepted from the Amendments); and 18 U.S.C. § 930 (prohibiting carrying of firearms in federal facilities under certain circumstances, which is not excepted from the Amendments).  The preemptive impact of the FGFSZA is less clear because the Oklahoma Attorney General has declared that the Amendments do not function to prohibit firearm policies enacted by Oklahoma schools.  *See* 2004 OK AG 39 (Dec. 7, 2004).

[30]  Without citation to authority, Plaintiffs mention the doctrine of "complete preemption" based on a "sheer number of [federal] conflicts."  (*See* ConocoPhillips' Add'l Br. on Preemption Issues 5.)  However, the doctrine of "complete preemption" is not a basis for invalidation of a state law under the Supremacy Clause.  Instead, it is a procedural doctrine that allows removal of certain state-law claims to federal court.  *See Turgeau v. Admin. Review Bd.*, 446 F.3d 1052, 1061 (10th Cir. 2006) (holding that "the 'complete preemption' doctrine has been referred to as a corollary or an exception to the well pleaded complaint rule" and that "[w]hen the doctrine is properly invoked, a complaint alleging only a state law cause of action may be removed to federal court on the theory that federal preemption makes the state law claim 'necessarily federal' in character").

forth how many conflicts must exist in order to wholly invalidate the state law.  In the absence of citation to such authority, the Court's preemption analysis is limited to the three categories articulated by the Supreme Court: express preemption, field preemption, and conflict preemption. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001); *Choate v. Champion Home Builders*, 222 F.3d 788, 792 (10th Cir. 2000).  Plaintiffs do not and cannot argue that Congress intended to occupy the entire "field" of firearm regulation to the exclusion of the States.  *See* 18 U.S.C. § 927 (stating that Congress does not intend to "occupy the field" of firearm regulation and that state laws may stand so long as they do not conflict).  Thus, Plaintiffs' challenges are necessarily based on the doctrine of "conflict preemption."  This doctrine requires detailed, individualized consideration of each allegedly preemptive federal law.  *See, e.g., Choate*, 222 F.3d at 795-97 (explaining that, in conducting a "conflict preemption" analysis, a court must evaluate the congressional intent and overall objectives of the allegedly preemptive federal law).  Accordingly, the Court must analyze Plaintiffs' preemption challenge individually as to each allegedly conflicting federal law.  In turn, for purposes of standing, the Court must analyze whether Plaintiffs have constitutional standing to make Supremacy Clause challenges as to each allegedly conflicting federal statute.

The Court assumes, without deciding, that Plaintiffs can meet the injury and causation elements for all preemption challenges.  However, the Court concludes that Plaintiffs cannot meet the "redressability" requirement for any federal statute or regulation raised, with the exceptions of the OSH Act and Brady Act.  This is because Plaintiffs cannot "show that a favorable judgment" as to any of the other allegedly preemptive federal statutes will "relieve [their] discrete injury." *Gandy*, 416 F.3d at 1154.  As an example, Plaintiffs argue that 39 C.F.R. § 232.1, which prohibits possession of firearms on postal property, preempts the Amendments.  If Plaintiffs were successful in this challenge, the Amendments would only be preempted to the extent they conflicted with this

29

federal law.  *See Dalton v. Little Rock Family Planning Serv.*, 516 U.S. 474, 476 (1996) (stating that, in cases where conflict preemption by federal law is the means for invalidation of state law, "state law is displaced only 'to the extent that it actually conflicts with federal law'") (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)).  Thus, a successful Supremacy Clause challenge would not permit Plaintiffs, who do not own or operate postal property, to maintain their policies or to avoid criminal prosecution.  Instead, Plaintiffs would be in the same position they were before bringing the lawsuit.  This same conclusion applies to all but two of the allegedly preemptive federal laws – the OSH Act and the Brady Act.  Therefore, the Court finds Plaintiffs lack standing to bring any Supremacy Clause challenges that, if successful, would not redress their alleged injuries and would not allow them to maintain the policies in the record before the Court.  *See Nat'l Audobon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (finding that plaintiff's alleged injury to the bird population was "redressable because if [plaintiff] wins on its preemption claims, the federal parties will resume their prior use of leghold traps, thereby redressing the injury by protecting the bird population"); *Antilles Cement Corp. v. Calderon*, 288 F. Supp. 2d 187, 193 (D.P.R. 2003) (finding that a plaintiff who solely imported foreign cement did not have standing to bring its Supremacy Clause challenge because the allegedly conflicting federal regulations dealt only with domestic commerce).[31]

   In contrast, the OSH Act's requirements clearly apply to Plaintiffs, all of which are "employers" under the OSH Act.  *See* 29 U.S.C. § 652(5) (defining "employer" as "a person

_____

[31] Plaintiffs essentially concede they do not have standing to assert preemption by certain federal statutes unless it is proper to wholly invalidate the Amendments based on the collective number of conflicts.  (*See* ConocoPhillips' Add'l Br. on Preemption Issues 8 ("[T]o the extent each conflict with federal law would only partially invalidate the Amendments . . ., ConocoPhillips acknowledges that many of the previously cited federal laws and regulations do not directly affect ConocoPhillips as a non-federal entity on non-federal land.").)

engaged in a business affecting commerce who has employees, but does not include the United States or any State or political subdivision of a State"). If the Court were to invalidate the Amendments based on the OSH Act, this would prevent enforcement of the Amendments against Plaintiffs, allow them to maintain their policies, and redress their alleged injuries. Further, to a more limited extent, invalidation by the Brady Act would also redress Plaintiffs' injuries by allowing Plaintiffs to exclude eight more categories of individuals than the Amendments currently permit them to exclude. *See* 18 U.S.C. § 922(g) (prohibiting nine specific categories of persons from possessing firearms, only one of which (convicted felons) is currently excepted from the Amendments). Accordingly, the Court finds that Plaintiffs have standing to assert Supremacy Clause challenges based on conflict with the OSH Act and the Brady Act.[32]

Plaintiffs have standing to assert the Takings Clause challenge, the Substantive Due Process Clause challenge, and a limited form of the Supremacy Clause challenge. There is therefore more than one constitutional question presented. As a general rule, "[w]hen a case presents two constitutional questions, one of which disposes of the entire case and the other of which does not, resolution of the case-dispositive question should suffice." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 62 (1999) (Ginsburg, J., concurring). Although the Court ultimately holds the Amendments are preempted by the OSH Act, the Court will  address the other two constitutional questions

---

[32]   As explained *infra* Part V, the Court concludes that the OSH Act preempts the Amendments. The Court therefore declines to address the Brady Act, which would provide only a more limited form of declaratory relief. *See Dalton*, 516 U.S. at 476 (stating, in the preemption context, that "a federal court should not extend its invalidation of a [state] statute further than necessary to dispose of the case before it"). For the same reason, the Court declines to address an alleged conflict with certain "interim regulations" propounded by the Department of Homeland Security. These interim regulations were raised for the first time in this litigation in the additional briefing ordered by the Court on other issues. (*See* ConocoPhillips' Add'l Brief on Preemption Issues 8.)

31

because they potentially entitle Plaintiffs to greater or different declaratory relief.  For example, a successful Takings Clause challenge could result in a finding that the Amendments constitute a taking of Plaintiffs' property without just compensation, entitling them to greater injunctive relief and/or compensation.  A successful Substantive Due Process Clause challenge would result in total invalidation of the Amendments, rather than only partial invalidation to the extent of conflict with federal law.  Therefore, the Court's OSH Act preemption holding does not "dispose[] of" Plaintiffs' entire case, and the Court will address all constitutional questions for which standing exists.  *See id.*

## III.     Takings Clause Challenge

### A.        Ripeness

Defendants have not raised the issue of ripeness of the Takings Clause challenge.  However, ripeness must be raised *sua sponte* by the Court because it pertains to the existence of subject matter jurisdiction.  *See Bateman v. City of W. Bountiful*, 89 F.3d 704, 706 (10th Cir. 1996).  The U.S. Supreme Court has set forth two specific ripeness requirements for typical claims arising under the Takings Clause:  (1) "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue"; and (2) "[a] taking claim is not yet ripe [until the property owner] . . . seek[s] compensation through the procedures the State has provided for doing so."  *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 194 (1985); *see also Bateman*, 89 F.3d at 708 (holding that Takings Clause claim was not "ripe for review because [plaintiff] has not sought compensation from the City pursuant to Utah's inverse condemnation law").

Despite Plaintiffs' failure to satisfy these typical requirements, the Court finds Plaintiffs' challenge ripe for review.  First, it must be noted that Plaintiffs seek a declaratory judgment.  The

Supreme Court has indicated that parties threatened with a taking may seek redress for their injuries notwithstanding certain ripeness requirements. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 71 (1978) ("While the Declaratory Judgment Act does not expand our jurisdiction, it expands the scope of available remedies. Here it allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."). Thus, the procedural posture of the case may render the *Williamson* requirements moot.

Second, the *Williamson* requirements have no application because, were they satisfied, they would not render the case any more or less ripe for judicial review. The first requirement relates to a final decision by a state or local agency regarding the property at issue. *See Williamson*, 473 U.S. at 187-88 (reasoning that a property owner did not meet the first ripeness requirement because he had submitted a plan to the relevant state agency but had not sought certain variances that could have resolved some of the agency's objections to the property owner's proposal). In this case, Plaintiffs argue that the Amendments function to deprive them of their right to exclude others engaging in an unwanted activity. The Amendments do so by their express language and by criminalizing Plaintiffs' policies that seek to exclude others engaged in the unwanted activity. In this case, there is no state agency charged with enforcing the Amendments, and there is no potential agency decision that would render the controversy more meaningfully developed. The second requirement relates to seeking compensation in state court. *See id.* This requirement has no application because Plaintiffs do not allege any economic impact resulting from the Amendments. Although a factual record is typically necessary to evaluate the economic harm caused by a taking, *see, e.g., Cienega Gardens v. United States*, 331 F.3d 1319, 1341 (Fed. Cir. 2003), Plaintiffs do not allege to have suffered economic harm as a result of the Amendments. Instead, Plaintiffs focus

exclusively on the Amendments' impact on their right to exclude.  Thus, to the extent the economic harm factor must be weighed as part of various takings analyses, which are discussed at length below, this factor will not weigh in favor of a taking.  *See Keystone Bitunimous Coal Ass'n v. DeBenedicts*, 480 U.S. 470, 495 (1987) (noting that challengers faced an "uphill battle" in facially attacking a law as a taking because they had not alleged any economic harm resulting from the regulations).

Finally, the Court finds the ultimate touchstones of a ripeness inquiry – "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" – weigh in favor of issuing a decision on the merits.  *See Bateman,* 89 F.3d at 706.  With respect to the "fitness of the issues for judicial decision," the Court has before it (1) the text of the Amendments (the alleged taking of private property rights); Plaintiffs' policies restricting firearms on their business property (the specific exercise of the allegedly injured property right); and (3) statements by Plaintiffs regarding the purposes and application of such policies (evidence of how the challenged law impacts their property rights).  This is sufficient for the Court to meaningfully evaluate the Takings Clause claim.  As to the second factor, there is "significant hardship" to the parties occasioned by withholding court consideration because the Amendments are criminal laws. Plaintiffs face the choice of eliminating/revising their policies (thereby suffering the alleged injury to their right to exclude) or maintaining their policies (thereby suffering the injury of criminal prosecution).   In sum, based on Plaintiffs' arguments and the record evidence, the "factual components of the dispute are sufficiently fleshed out to permit meaningful judicial review." *Id.* at 707.

### B.      Framework for Analysis

The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that private property shall not be taken for public use without just compensation. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005). The Takings Clause does not prohibit the taking of private property but instead places a condition on the exercise of that power. *Id.* It "is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *Id.* at 537. The "paradigmatic" taking is a direct government appropriation of private property. *Id.* In addition to outright appropriation of property, the government may effect a taking through a regulation if it is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Id.* This is known as a "regulatory taking." Plaintiffs argue the Amendments result in a "regulatory" taking due to the burden the Amendments place on their private property rights – specifically, the burden placed on their right to exclude.

In *Lingle*, the Supreme Court provided a framework for addressing regulatory takings. First, a court must determine if the regulation results in one of two types of "*per se*" regulatory takings. *Id.* at 538. These occur (1) where a regulation requires an owner to suffer a "permanent physical invasion" of the property (known as a *Loretto* or physical taking); or (2) where a regulation completely deprives an owner of "all economically beneficial uses" of the property (known as a *Lucas* taking). *Id.* If a regulation results in a *per se* taking, this ends the inquiry. If a regulation does not qualify for *per se* treatment, it is analyzed under the *ad hoc* balancing test first set forth in

*Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978).  *See Lingle*, 544 U.S. at 538.[33]

Although they have different theoretical underpinnings, all three takings inquiries, *Loretto*, *Lucas*, and *Penn Central*, share a "common touchstone."  *Id*. at 539.  "Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  *Id*.  Each of the tests focuses directly on the "severity of the burden that government imposes upon private property rights."  *Id*. In the *Loretto* context, the "evisceration" of the owner's right to exclude is sufficient to constitute a taking, without regard to economic harm.  *Id*.  In the *Lucas* context, the complete elimination of a property's value is the determinative factor.  *Id*.  In the *Penn Central* context, the inquiry is "cryptic," but the ultimate question is whether the regulation has gone "too far."  *Id*. at 537-38. Whether a regulation has gone "too far" turns in part on "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."  *Id*. at 538.[34]

---

[33]  The Supreme Court identified another "special" category of cases involving land-use exactions, which are defined as "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit."  *Id.* at 546 (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994)).  In both *Nollan* and *Dolan*, the Supreme Court applied something similar to a "substantially advances" test in finding unconstitutional takings had occurred, which, as explained *infra* note 34, was overruled by the Supreme Court in *Lingle*.  The *Lingle* Court did not overrule *Nollan* and *Dolan*, however, because both cases involved "dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings."  *Lingle*, 544 U.S. at 546.  Therefore, in addition to *Loretto*, *Lucas*, and *Penn Central* takings challenges, a plaintiff may also make a "*Nollan/Dolan*"-type challenge if the regulation is a land-use exaction.  There is no land-use exaction in this case, and the test applied in *Nollan* and *Dolan* has no application.

[34]  Before its 2005 decision in *Lingle*, the Supreme Court authorized use of a "substantially advances" test in the context of regulatory takings.  *See id.* at 540.  Under this test, a regulation of private property rights could be considered an unconstitutional taking if the regulation did not "substantially advance" legitimate state interests.  *See id.*  This allowed courts to conduct a type of

(continued...)

Plaintiffs rely primarily on *per se*, *Loretto*-type physical takings cases but also rely on cases that were analyzed under *Penn Central*. Due to the complexity of the takings analysis and for the sake of clarity, the Court will address all potential types of regulatory takings. First, the Court will determine if the Amendments qualify for either of the two types of *per se* treatment. If they do not, the Court will evaluate whether the Amendments are a regulatory taking under the *Penn Central* balancing test.

### C.   *Per se* Analysis

#### 1.   *Per Se* "*Lucas*" Economic Taking

In this case, the Court easily concludes that the Amendments do not qualify as a *per se* "*Lucas*" taking because they do not deprive Plaintiffs of all economically beneficial uses of their property. In fact, Plaintiffs have not alleged in their various Complaints or argued in their briefs that they have suffered any deprivation of economically beneficial uses of their property.

---

[34](...continued)
heightened "means-end" analysis of regulations of property rights to determine if they would advance the objectives of the regulation. This analysis was divorced from other factors, such as the character of the governmental intrusion or the economic harm caused to the challengers. *Id.* In *Lingle*, the Court struck down the substantially advances test as a stand-alone takings test, reasoning that it was actually an "inquiry in the nature of due process" and was "not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment" because it "reveals nothing about the magnitude or character of the burden a particular regulation imposes upon private property rights." *Id.* at 541-42.

Plaintiffs urge the Court to subject the Amendments to "strict scrutiny" as part of its "takings" analysis. (*See, e.g.*, Reply Br. in Support of Request for Perm. Inj. and Declaratory Relief 3 ("This authority [classifying right to exclude as one of the most essential property rights] leads to the inevitable conclusion that [the Amendments] work an unconstitutional *taking* of ConocoPhillips' fundamental right to exclude persons and activities on its property. These statutes cannot survive the *strict scrutiny* by which they must be examined.") (emphasis added).) This, however, would be an improper inquiry in the nature of due process. After *Lingle*, courts may not intermingle the due process and takings inquiries. *See generally* R.S. Radford, *Just a Flesh Wound? The Impact of Lingle v. Chevron on Regulatory Takings Law*, 38 URB. LAW. 437 (Summer 2006).

### 2. *Per Se "Loretto" Physical Taking*

The Amendments result in an unwelcome physical invasion onto Plaintiffs' property by individuals transporting and storing firearms in their vehicles, under express authorization of state law. It is apparent the invasion onto Plaintiffs' property is unwelcome because Plaintiffs have corporate policies preventing precisely these types of invasions. By forcing this unwanted invasion of third parties engaging in an unwelcome activity, the Amendments adversely affect Plaintiffs' right to exclude, which is considered the most "fundamental" of all property rights. *See Lingle*, 544 U.S. at 539 (reasoning that right to exclude is "perhaps the most fundamental of all property interests"); *Hendler v. United States*, 952 F.2d 1364, 1377 (Fed. Cir. 1991) ("In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession – the right to exclude strangers, or for that matter friends, but especially the Government."). The question is whether the Amendments' effect on Plaintiffs' right to exclude is sufficiently similar or identical to cases in which the Supreme Court has found a *per se* taking of a landowner's property rights.

In *Loretto v. Teleprompter Manhattan CATV Corporation*, 458 U.S. 419, 434-35 (1982), the Supreme Court first carved out the category of *per se* physical takings. In *Loretto*, the Court distinguished temporary physical "invasions" from permanent physical "occupations." The Court made clear that not every limitation on the right to exclude is deserving of *per se* treatment, notwithstanding the importance of the right to exclude in the bundle of property rights. Specifically, the Supreme Court stated:

> The permanence and absolute exclusivity of a physical occupation distinguish it from *temporary limitations on the right to exclude.* Not every physical invasion is a taking. As *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L. Ed. 2d 741 (1980); *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L. Ed. 2d 332 (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing

> process to determine whether they are a taking. The rationale is
> evident: they do not absolutely dispossess the owner of his rights to
> use, and exclude others from, his property.

*Loretto*, 458 U.S. at 436 n.12 (emphasis added).   The Court in *Loretto* further stated that "whether

a permanent physical occupation has occurred presents relatively few problems of proof" because

"[t]he placement of a fixed structure on land or real property is an obvious fact that will rarely be

subject to dispute." *Id.* at 437.   Interpreting these principles in *Loretto*, the Federal Circuit has held:

"Physical invasions (as distinct from physical occupations) thus fall outside the *Loretto* rule. A

physical occupation, as defined by the Court, is a permanent and exclusive occupation by the

government that destroys the owner's right to possession, use, and disposal of the property." *Boise*

*Cascade Corp. v. United States*, 296 F.3d 1339, 1353 (Fed. Cir. 2002) (concluding that periodic

physical "invasion" of private property by government surveyor to conduct owl surveys was not a

*per se* taking).   Thus, *per se* treatment has typically been applied to physical occupations of

property, such as occupation by a physical structure on property. *See, e.g., Loretto*, 458 U.S. at 422

(holding that a cable line that was "less than one-half inch in diameter and approximately thirty feet

in length along the length of the building . . . on the front and rear of the roof" constituted a *per se*

physical taking); *Hendler*, 952 F.2d at 1377 (holding that government's placement of groundwater

monitoring wells on plaintiff's property and government's periodic presence for installing and

servicing wells constituted a *per se* physical taking).

     In addition to the "physical occupation" and "physical structure" cases, recent Supreme

Court case law indicates that other types of physical invasions also qualify for *per se* treatment.  For

example, the *Lingle* Court indicated that, if a government regulation forces a physical easement

across an owner's property in order to give the public a right of way across that portion of the land,

this would qualify as a *per se* physical taking.  *See Lingle*, 544 U.S. at 546.  In reaching this

conclusion, the Court in *Lingle* cited two cases in which the government had demanded a public easement as a condition for granting a land permit. *See Dolan*, 544 U.S. at 379-80 (permit to expand a store and parking lot conditioned on the dedication of a portion of the relevant property for a "greenway," including a bike/pedestrian path); *Nollan*, 483 U.S. at 828 (permit to build a larger residence on beachfront property conditioned on dedication of an easement allowing the public to traverse a strip of the property between the owner's seawall and the mean high-tide line). In its analyses in *Nollan* and *Dolan*, which were adopted by the Supreme Court in *Lingle*, the Supreme Court reasoned that, had the government simply appropriated the easements in question (rather than conditioning permits on the required easements), such appropriations would have amounted to *per se* physical takings. *See Dolan*, 544 U.S. at 384; *Nollan*, 483 U.S. at 831-32. This Court interprets *Lingle*, *Nollan*, and *Dolan* as holding that, if a regulation results in the taking of a forced public easement across property, this is a dedication of property so onerous that it results in a *per se* physical taking.

Further supporting this interpretation, the Supreme Court in *Lingle* referred to the case of *Kaiser Aetna v. United States*, 444 U.S. 164, 178 (1979) (holding that government's imposition of a navigational servitude requiring public access to a pond on private property was a taking), as a *per se* physical taking case. *See Lingle*, 544 U.S. at 539 (listing *Kaiser Aetna* in a string cite following a description of a *per se* physical taking). This is significant because it marks a shift in prior treatment of the *Kaiser Aetna* decision. In *Loretto*, the Court had clearly classified *Kaiser Aetna* as a type of case that must be analyzed under *Penn Central*'s balancing test. *See Loretto*, 458 U.S. at 433 ("Although the easement of passage, not being a permanent occupation of land, was not considered a taking *per se*, *Kaiser Aetna* reemphasizes that a physical invasion is a government

intrusion of an unusually serious character.").[35]   In *Lingle*, the Supreme Court appears to have departed from this reasoning in *Loretto* and concluded that certain physical invasions by the government or third parties authorized by the government may also qualify as *per se* physical takings.  *See Lingle*, 544 U.S. at 539 (citing *Kaiser Aetna*, *Nollan*, and *Dolan*, all of which involved types of forced public easements, as examples of *per se* physical takings due to their impact on the property owner's right to exclude).   Accordingly, the Supreme Court has indicated that certain regulations forcing public easements across private property, which inevitably result in the unwanted invasion of third parties, may also qualify for *per se* treatment.

Another important aspect of the Supreme Court's *per se* takings jurisprudence is that the invasion must be deemed "permanent."  *See Lingle*, 544 U.S. at 538 (stating that to qualify for *per se* status, the invasion must be a "permanent physical invasion").   However, applying the "permanence" requirement in the takings context can be a difficult task.  *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1357 (Fed. Cir. 2006) (explaining that, in context of physical takings, "'permanent' does not mean forever, or anything like it").

Applying the above principles to this case, the Court easily concludes the Amendments do not force any permanent "physical structure" on Plaintiffs' property, such as the cable lines at issue in *Loretto*.   Instead, they force an unwanted physical invasion by third parties engaging in an unwanted activity.  The more difficult question is whether the forced invasion is sufficiently similar to the "forced public easement" cases to justify *per se* treatment.   On one hand, the Amendments result in a taking similar to a forced public easement because they force Plaintiffs to allow invasion

---

[35]   In the *Kaiser Aetna* decision itself, the Supreme Court applied a *Penn Central*-type balancing test, and the Court's decision turned in large part on the substantial devaluation of the challenger's property.  *See Kaiser Aetna*, 444 U.S. at 178-80.

of their property by third parties.  The reason the forced public easement cases are given *per se* treatment is tied to their impact on the property owner's right to exclude.  *See Lingle*, 544 U.S. at 539 ("A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's *right to exclude* others from entering and using her property – perhaps the most fundamental of all property interests.") (citing, immediately thereafter, *Loretto* and the public easement cases) (emphasis added).  There can be no doubt that the Amendments burden Plaintiffs' right to exclude because the Amendments prohibit exclusion of what Plaintiffs perceive to be a dangerous activity on their business properties and impede Plaintiffs' ability to "provid[e] a safe workplace." (*See, e.g.*, Aff. of James Snyder, Mot. for TRO and/or Prelim. Inj. Relief, Ex. B ¶ 7.)[36]  The burden imposed on Plaintiffs' right to exclude is more qualitative than quantitative.  That is, the alleged injury flows from what type of activity is being forced on Plaintiffs rather than the frequency or magnitude of the forced invasion.  The Court found no case subjecting a regulation to *per se* treatment due to the *type* of unwanted activity it forces a property owner to allow.  Instead, the nature of the governmental intrusion is more typically analyzed under the "character of the governmental intrusion" prong of a *Penn Central* analysis.  *See, e.g., Cienega Gardens*, 331 F.3d at 1338 (addressing regulation that impacted a landlord's right to exclude certain tenants and discussing type of invasion forced upon the landlord under the "character of the governmental intrusion" prong of a *Penn Central* inquiry).  Nonetheless, the Amendments adversely impact Plaintiffs' right to exclude third parties from their private property, making the intrusion forced by the Amendments similar to the intrusion forced in the public easement cases.

---

[36]  Mr. Snyder is the Manager of Global Security for ConocoPhillips.  (*See id.* ¶ 1.)

On the other hand, the Amendments do not result in a taking similar to a public easement across a strip of property because Plaintiffs' right to exclude is not altogether "eviscerated" by the Amendments.  *See Lingle*, 544 U.S. at 539 ("A permanent physical invasion . . . *eviscerates* the owner's right to exclude others from entering and using her property.") (emphasis added).  The easements at issue in *Nollan*, *Dolan*, and *Kaiser Aetna* allowed the entire general public a right of way across the private property.  The property owners' right to exclude, as to that parcel of property, was completely destroyed in that they could not exclude any person at any time.  The imposition of the easement had a similar effect as had the government physically occupied that portion of the land, thereby dispossessing the property owner of not only the right to exclude but also the right to use that portion of the property as he desired.  In this case, Plaintiffs have lost only their ability to exclude certain individuals engaging in an unwanted activity rather than the right to exclude all individuals at all times.  Therefore, the Amendments do not result in complete "evisceration" of the right to exclude as to any parcel of Plaintiffs' respective properties.

With respect to the issue of "permanence," the invasion in this case is permanent only in that individuals are granted a "permanent" right to enter Plaintiffs' property engaging in the unwanted activity should they choose to do so.  However, the invasion itself is not "permanent" because the individuals engaging in the unwanted activity do not remain on the property at all times, as would an actual physical structure. Nor do the Amendments cause a "permanent" invasion by the government *vis a vis* a particular parcel of property, such as the public paths at issue in the public easement cases.  In those cases, even if no person ever chose to ride his bike across a public path, there is nevertheless governmental intrusion because that particular parcel of land is stripped of its right to exclude.  In this case, Plaintiffs have kept their entire parcel of property intact.  If no individuals choose to engage in the activity of transporting firearms in vehicles, Plaintiffs will not

43

suffer unwanted invasions.  It is therefore problematic to classify the invasion caused by the Amendments as "permanent" for purposes of a takings analysis.

After considering all aspects of the forced invasion, the Court concludes the Amendments do not qualify for *per se* treatment under the forced public easement line of cases.  Although the Amendments do pose a unique and substantial burden on property rights because the activity being forced on Plaintiffs is onerous and potentially dangerous, it is simply not the type of invasion that has been carved out to receive *per se* treatment by the Supreme Court.  Although the Supreme Court has expanded the universe of *per se* cases to include some types of physical invasions by unwanted third parties, as opposed to merely occupations by physical structures, these cases are limited to situations in which the right to exclude is "eviscerated" because the property owner must provide the entire general public a right of way.  In this case, Plaintiffs' bundle of property rights, including the right to exclude, is largely intact.  Plaintiffs maintain the right to exclude most members of the general public from their property if they so desire.  Plaintiffs also maintain the right to use, enjoy, and transfer their entire parcel of property for purposes of conducting their respective businesses. Although it is a close question because the right to exclude (the most fundamental of all property interests) is impaired, the Court cannot conclude that the Amendments qualify for *per se* treatment. Instead, the invasion is more akin to the "temporary physical invasion" cases that courts have analyzed under the *Penn Central* balancing analysis.  *See Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 82 (1980) (analyzing California constitutional provision permitting individuals to exercise free speech rights on private property against the wishes of the private property owner under a balancing test);[37] *Cienega Gardens*, 331 F.3d at 1337-38 (applying *Penn Central* test to regulation

---

[37] In *Pruneyard*, which was decided in 1980, the Supreme Court did not analyze whether (continued...)

that forced landlords to allow a "physical invasion" of their buildings by certain unwanted tenants); *Boise Cascade*, 296 F.3d at 1357 (holding that government official's periodic intrusion onto private property for purpose of conducting owl surveys over a period of five months was not a *per se* taking and must be analyzed under *Penn Central* test).

### D.     *Penn-Central* Analysis

Regulations that are not *per se* takings or that do not involve land-use exactions are analyzed under the *Penn Central* balancing test.  *See Lingle*, 544 U.S. at 538.  In conducting a *Penn Central* inquiry, the Court must begin with the premise that "'[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'"  *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1429 (10th Cir. 1986) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).  Therefore, the Takings Clause preserves governmental power to regulate, subject only to the dictates of justice and fairness.  *Id.* Factors that must be considered in a *Penn Central* analysis include the character of the governmental intrusion; the degree of interference with the reasonable, investment-backed expectations of the property owner; and the economic impact of the action.  *See Mountain States Legal Found.*, 799 F.2d at 1429; *see also Cienega Gardens*, 331 F.3d at 1337.

---

[37](...continued)
to apply a *per se* or a *Penn Central* analysis because those distinct categories did not exist. Nonetheless, the temporal and physical nature of the invasion at issue in *Pruneyard* is quite similar to that presented here, and the Supreme Court analyzed all the *Penn Central* factors in determining whether a taking occurred.  *See id.* at 83.  Although this Court believes there are important distinctions between this case and *Pruneyard* based on the type of invasion forced, *Pruneyard* generally supports the Court's conclusion that a *Penn Central* balancing analysis, rather than a *per se* analysis, is appropriate.

## 1.    Character of Governmental Intrusion

As to the first factor, courts must consider whether the intrusion amounts to an actual "physical invasion or instead merely affects property interests through a public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle*, 544 U.S. at 539. Courts may also "balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint." *Cienega Gardens*, 331 F.3d at 1337-38.

There are five specific characteristics of the governmental intrusion in this case that are unique and that, in the Court's view, result in a severe deprivation of property rights. First, although the Amendments do not rise to the level of a *per se* physical taking of Plaintiffs' property, the Amendments do result in a significant "physical invasion" of Plaintiffs' property by third parties. The Amendments are not "a mere regulatory program that adjusts the burdens and benefits of economic life." *Lingle*, 544 U.S. at 539.  Instead, the Amendments are a direct and serious deprivation of the right to exclude, which, as explained above, is the most treasured and fundamental of all property interests.  *See id.*; *Loretto*, 458 U.S. at 433 (stating that a "physical invasion is a government intrusion of an unusually serious character"); Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730, 735 (1998) (explaining that "governmental interference with the right to exclude is more likely to be considered a taking of property without compensation . . . than are interferences with other traditional elements of property" and that "[n]o other right has been singled out for such extravagant endorsement by the [Supreme] Court"); *see also Cienega Gardens*, 331 F.3d at 1338 (reasoning, under "character of the governmental intrusion" prong of the *Penn Central* inquiry, that federal regulation forcing property owners to allow holdover tenants is in the

nature of physical taking because the regulation impacted their right to exclude and resulted in a forced physical invasion).[38]

Second, the type of invasion "forced" upon Plaintiff involves the transportation and storage of firearms in vehicles on company parking lots, which, in these Plaintiffs' opinions, is a potentially dangerous activity. (*See, e.g.*, Aff. of James Snyder, Mot. for TRO and/or Prelim. Inj. Relief, Ex. B ¶ 7.) Under Oklahoma law, the types of firearms that Plaintiffs must allow on their corporate property include loaded concealed handguns (if the individual has a concealed weapons license); clip and magazine loaded rifles and shotguns; and unloaded pistols, rifles, and shotguns. All types of unloaded firearms may be in the immediate vicinity of ammunition. *See supra* Part I.B. The Amendments place no restrictions on the number of firearms allowed. Thus, the Amendments force a significant physical invasion of unwanted firearms and ammunition on private property.[39]

---

[38] Defendants have not raised the issue of whether Plaintiffs' employees' status as guests on their property weakens Plaintiffs' argument. The Court will briefly address this issue. Plaintiffs' employees are invited onto Plaintiffs' property for the purpose of working. This leads to the question of whether Plaintiffs can simply terminate employees engaging in the unwanted activity, thereby mitigating the Amendments' effect on their right to exclude. The answer is uncertain. It is possible, however, that the Amendments may be considered an articulation of "public policy" of the State of Oklahoma that would subject Plaintiffs to a wrongful termination suit under *Burk v. K-Mart*, 770 P.2d 24, 29 (Okla. 1989), in the event such employees were terminated. Creation of such a "public policy" was the original intended purpose of the Amendments. (*See* Aff. of Author of Subject Statute ¶ 3.) Further, in light of the Amendments, such terminations would no longer be considered "statutorily sanctioned," as they were when the Tenth Circuit last considered this issue. *See Bastible v. Weyerhauser Co.*, 437 F.3d 999, 1008 (10th Cir. 2006) (holding that the Oklahoma Constitution did not articulate a public policy that would give rise to a wrongful termination because "establishing a wrongful discharge tort *for exercising a statutorily sanctioned restriction* [contained in former version of § 1290.22] on the right would be counterintuitive") (emphasis added). For purposes of this analysis, the Court assumes Plaintiffs cannot circumvent the effect of the Amendments by terminating individuals engaging in the unwanted activity. More to the point, Plaintiffs should not be forced to terminate otherwise productive employees in order to fully enjoy their private property rights.

[39] The Brady Center Article notes that, under the Amendments, "there is no limitation on
(continued...)

Even in the *Penn Central* context, the Court was unable to locate any cases discussing the constitutionality of a "forced" activity that involves potential danger to the property owner and/or danger to invited guests of the property owner. However, the invasion is highly distinguishable from the more innocuous character of the government intrusion at issue in other "temporary" physical invasion cases. For example, in *Pruneyard*, wherein the property owner sought to exclude individuals engaging in peaceful distribution of leaflets on his business premises, the Supreme Court stated that those engaging in the unwanted activity on the shopping center's property "were orderly, and they limited their activity to the common areas of the shopping center. In these circumstances, the fact that they may have 'physically invaded' appellants' property cannot be viewed as determinative." *Pruneyard*, 447 U.S. at 85. Regardless of one's view of the importance of the right to bear arms, it cannot be disputed that forcing a property owner to allow loaded and unloaded firearms on his private property is more onerous than allowing the peaceful distribution of leaflets on his property. *See id.* It is also more onerous than allowing entry of a government inspector to periodically enter one's property over a five-month period for the purpose of conducting owl surveys. *See Boise Cascade*, 296 F.3d at 1357. For similar reasons, in considering "the liberty interest of the private property owner" that is at stake in this case, *see Cienega Gardens*, 331 F.3d at 1337-38, Plaintiffs' liberty interest in excluding firearms from their business premises is significantly more compelling than liberty interests in excluding activities perceived by the landowner to cause a threat to safety. Plaintiffs' liberty interest in this case is therefore more likely to outweigh the "Government's need to protect the public interest through imposition" of the

---

[39](...continued)
the type or number of guns that can be brought onto someone's private property" and that "anyone will be free . . . to drive onto private property in Oklahoma with a trunk or van full of guns." Brady Center Article, *supra* note 4, at 2.

Amendments.  *See id.*; *see also* Raneta Lawson Mack, *This Gun For Hire: Concealed Weapons Legislation in the Workplace and Beyond*, 30 CREIGHTON L. REV. 285, 306 (1997) [hereinafter "*Gun for Hire*"] (presenting argument that "carrying concealed weapons, even lawfully, presents the likelihood of increased physical violence and endangerment above and beyond the concerns typically contemplated in First Amendment cases").

Third, the "invaders" in this case are engaging in the right to bear arms, which under Oklahoma law is "is not absolute, but remains subject to reasonable regulation under the State's police power." *See Bastible*,  437 F.3d at 1006.  Thus, the nature of the invasive activity does not receive the same level of protection as, for example, the exercise of a fundamental right.  *See Gun for Hire*, *supra*, at 306 (arguing that "excluding citizens who lawfully carry concealed weapons from private property does not present the controversial dichotomy of exercising fundamental rights versus private property interests").

Fourth, the Amendments do not allow a mechanism whereby Plaintiffs can control or minimize the unwanted invasion.  In *Pruneyard*, for example, the Supreme Court reasoned that the shopping center could "restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions."  *Pruneyard*, 447 U.S. at 83.  Plaintiffs in this case wish to prohibit unauthorized firearms altogether on their property, but there is nothing similar to a "time, place, and manner" exception to the Amendments.  Although Plaintiffs could adopt new policies that disallowed firearms in compliance with the Amendments, *i.e.*, that prohibit firearms in places other than locked vehicles, this does little to reduce the dangers sought to be avoided by Plaintiffs' policies.  As stated by Mr. Snyder: "ConocoPhillips believes this commitment to safety also includes excluding individuals from its parking lots when the individuals in question possess firearms in their vehicles –  regardless of whether the vehicle is locked.

ConocoPhillips considers its parking lots an integral part of its workplace, as employees are frequently found in the parking lots during breaks and lunch periods." (*See* Aff. of James Snyder, Mot. for TRO and/or Prelim. Inj. Relief, Ex. B ¶ 7.)  As more fully explained in the Court's discussion of OSH Act preemption, *see infra* Part V.D, the Court agrees with Plaintiffs that limiting firearms to vehicles does little to control the dangers Plaintiffs' policies seek to prevent.

Finally, the "regulation" of private property occasioned by the Amendments is in the form of a criminal sanction.  A criminal law quells all opportunity to seek compensation for the deprivation of property rights or to experiment with the imposition of new policies that could maximize Plaintiffs' right to exclude.  Instead, Plaintiffs must, out of a fear of criminal liability, cease all attempts to exclude others engaging in the unwanted activity of transporting and storing firearms on company property.  Although no cases were found addressing a similar type of law – one that criminalizes the exercise of the right to exclude – the criminal nature of the restriction renders the burden more severe for purposes of a takings analysis.

One aspect of the "character of the governmental intrusion" prong does not weigh in favor of Plaintiffs – namely, whether the Amendments force Plaintiffs to "bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *See Cienega Gardens*, 331 F.3d at 1340 (quotation omitted).  In *Cienega Gardens*, the court reasoned that the "character of government intrusion" prong weighed in favor of the property owners because the regulation accomplished its stated purpose of assisting those in need of low-income housing by placing a "disproportionate burden" on a few private property owners rather than burdening society as a whole.  *See id.* at 1338-39 ("Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed

disproportionately on a few private property owners."). The court reasoned that this kind of "expense-shifting to a few persons" amounted to a taking requiring just compensation. *Id.*

The text of § 1289.7a of the OFA, as it existed in 2004 and as it was amended in 2005, extends its prohibition to policies or rules enacted by "person[s], property owner[s], tenant[s], employer[s], [and] business entiti[es]." *See* OKLA. STAT. tit. 21, § 1289.7a. The text of § 1290.22(B) of the OSDA also extends its prohibition to policies or rules enacted by "person[s], property owner[s], tenant[s], employer[s], [and] business entiti[es]." *See id.* § 1290.22. Thus, assuming the objective of the Amendments is to protect public safety and deter crime (as discussed in more detail *infra* Part IV), the burden imposed on property rights to further these objectives is applied to various types of private property owners, including persons, tenants, employers, and business entities. Plaintiffs are therefore not singled out unfairly to bear the burden of accomplishing the regulatory objectives.[40]

In sum, the Court finds the "character of the governmental intrusion" to be severe because the Amendments eliminate Plaintiffs' right to exclude perceived danger from their corporate property. Plaintiffs have presented evidence that they wish to exclude firearms because they increase the risk of harm and violent occurrences on Plaintiffs' business premises. The Court finds the character of the governmental intrusion distinguishable from that at issue in *Pruneyard* because, in *Pruneyard*, the physical invasion involved First Amendment expression that posed no danger to the shopping center or its patrons and the shopping center was able to impose time, place, and

---

[40] The title of § 1290.22 of the OSDA is "Business Owner's Rights." However, the plain language of the provision extends to all types of property owners.

51

manner restrictions to mitigate the unwanted effects of the activities.[41]  In contrast, the Amendments require allowance of an activity that Plaintiffs find repugnant to the use and enjoyment of their business property.  Further, the Amendments not only "regulate" Plaintiffs' policies of excluding firearms from their company premises, they criminalize them.  This leaves Plaintiffs in the position of exposing their employees to potential danger or violating a criminal law.  On balance, the Court concludes that the "character of the government intrusion" weighs strongly in favor of Plaintiffs.

### 2.    Economic Harm/Interference with Investment-Backed Expectations

With respect to the economic harm prong, the Federal Circuit has stated:  "What has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation.'"  *Cienega Gardens*, 331 F.3d at 1340 (citations omitted); *Hendler*, 952 F.2d at 1373 (discussing difficulty of applying *Penn Central* test but concluding that "at bottom what emerges is at least the basic notion that the government, under the guise of regulation, cannot take from a property owner the core economic value of the property, leaving the owner with a mere shell of shambled expectations").  The Supreme Court has stated that the *Penn Central* inquiry turns in large part on the "magnitude of a regulation's economic harm."  *See Lingle*, 544 U.S. at 539.  Thus, economic loss seems to be a requirement of a *Penn Central* taking rather than merely one factor in the analysis.  Indeed, the ultimate goal of a takings analysis is not to determine whether the government has the right to take the property at all but instead to determine what compensation is due in the event of a taking.  *See id.* at 537 (explaining that Takings

---

[41] Some commentators have reasoned that *Pruneyard* should not be read to diminish the importance of the right to exclude.  *See* David L. Callies, J. David Breemer, *The Right to Exclude Others From Private Property: A Fundamental Constitutional Right*, 3 WASH. U. J. L. & POL'Y 39, 52-54 (2000).

Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking").

In this case, Plaintiffs have made not made any allegations or presented any evidence of economic harm or interference with their investment-backed expectations.[42] The Court is not aware of any case outside the *per se* context finding a regulatory taking in the absence of some allegation or showing of economic harm or interference with investment-backed expectations.[43] Based on the Court's research, precedent does not support a finding that the "character of the governmental intrusion" prong can overcome the absence of economic harm or some interference with investment-backed expectations. Thus, although the Court has significant concerns about the character of the governmental intrusion, the Court cannot conclude that the Amendments result in a *Penn Central* taking because Plaintiffs do not allege the Amendments have lowered their property value, hindered their ability to make profits, or otherwise caused them any economic harm. *See Keystone Bitunimous Coal Ass'n*, 480 U.S. at 495 (finding that challengers faced an "uphill battle" in making a facial challenge to a regulation because they had not claimed, at that stage in the case, that the act made it "commercially impracticable for them to continue mining their bituminous coal interests in

---

[42] Although Plaintiffs have not done so in this case, other business or property owners may be able to show that forced entry of firearms onto their property causes economic harm. *See* Brady Center Article, *supra* note 4, at 6 (stating that "guns increase the risk of violence in workplaces" and that "[c]osts linked to workplace violence have skyrocketed in recent years; from $4.2 billion in 1992, to $36 billion in 1995, to an estimated $121 billion in 2002" (citations omitted)).

[43] One Supreme Court case held that a regulatory taking had occurred in the absence of interference with investment-backed expectations. *See Hodel v. Irving*, 481 U.S. 704, 715-16 (1987) (holding that statute abrogating common law right to devise to one's heirs even a small portion of property was a regulatory taking because the character of the governmental intrusion was "extraordinary"). However, even in *Hodel*, the Supreme Court found that the regulations caused economic harm to the challengers in the amount of $2,700.00 and $1,816.00 and found that these "were not trivial sums." *See id.* at 714. There are no such allegations before the Court.

western Pennsylvania"); *Pruneyard*, 447 U.S. at 83 (reasoning that constitutional provision did not constitute a taking, in part, because there was "nothing to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value or use of their property as a shopping center").

The Court spent considerable time analyzing the takings issue because Plaintiffs' arguments have visceral appeal. It does not seem logical that a state can force a property owner to allow the invasion of firearms onto his property. However, the Supreme Court has carefully carved out categories of takings that are deserving of *per se* treatment, and the invasion in this case does not fit neatly into these categories. Further, the Supreme Court has never sanctioned a finding of a *Penn Central* taking in the absence of allegations of economic harm. The Tenth Circuit or the Supreme Court may expand the *per se* categories to include some types of temporary invasions that involve a particularly onerous activity, or may determine that a *Penn Central* taking can occur in the absence of economic harm if the character of the government intrusion is sufficiently severe. This Court, however, must interpret the law as it exists and does not find precedential support for the proposition that the Amendments result in a regulatory taking under any of the possible theories.[44]

---

[44] Article 2, Section 24 of the Oklahoma Constitution provides that "private property shall not be taken for public use without just compensation." OKLA. CONST. art. 2, § 24. Plaintiffs rely exclusively on federal case law in making their takings claim and argue that the federal takings analysis provides the proper framework for determining whether the Amendments violate the Oklahoma Constitution. (*See* Br. in Support of Request for Perm. Inj. and Declaratory Relief 7-10.) The Court agrees that the federal framework and the Oklahoma framework are coextensive. For example, the Oklahoma Supreme Court has recognized that assertions of dominion or control over property can result in *de facto* takings while exercises of the police power that merely "impair the use of property" generally do not constitute a taking. *See Matoon v. City of Norman*, 617 P.2d 1347, 1349 (Okla. 1980). Therefore, the Court's conclusion that a taking has not occurred under the U.S. Constitution extends equally to a takings analysis under the Oklahoma Constitution.

**IV.      Substantive Due Process Clause Challenge**

Plaintiffs also challenge the Amendments as a violation of their substantive due process rights.  Specifically, Plaintiffs contend that the right to exclude others from private property is a "fundamental right," that the Amendments must be subjected to strict scrutiny, and that the Amendments cannot survive a strict scrutiny analysis because they are not narrowly tailored to meet their objectives.

The "substantive component of the Due Process Clause provides heightened scrutiny against government interference with certain fundamental rights and liberty interests." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004) (quotation omitted).  "Fundamental rights" are those that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty or justice would exist if they were sacrificed." *United States v. Deters*, 143 F.3d 577, 582 (10th Cir. 1998) (quotation omitted).  If the law affects a fundamental right, it "will not survive judicial scrutiny unless it serves a compelling state interest and is narrowly tailored to effect that interest." *Id.*  If the law does not affect a fundamental right, heightened scrutiny is not appropriate, and the law is subject only to rational basis review.  *See Powers*, 379 F.3d at 1215.

Plaintiffs did not cite any authority holding that the right to exclude others from private property qualifies as a "fundamental right" for purposes of a substantive due process analysis. Plaintiffs rely on case law arising under the Takings Clause that labels the right to exclude as one of the most treasured strands in an owners' bundle of *property* rights.  (*See* Br. in Support of Request for Perm. Inj. and Declaratory Relief 8.)  For example, in *Lingle*, the Supreme Court declared the right to exclude to be "the most fundamental of all property interests." *Lingle*, 544 U.S. at 539-40 (emphasis added).  However, the Supreme Court's statement in *Lingle* merely emphasized the importance of the right to exclude within the bundle of *property* rights for purposes of a Takings

Clause analysis. This is a far cry from declaring the "right to exclude" to be a "fundamental right" protected by the substantive component of the Due Process Clause. Significantly, in the *Lingle* case itself, the Supreme Court stated it had "long eschewed [] heightened scrutiny when addressing substantive due process challenges to government regulation [of property rights]," *see id.* at 545, and indicated that the "arbitrary and irrational" test must be applied to regulations of property rights, *see id.* at 543 (stating that a regulation of property may be "so arbitrary as to violate due process"). Therefore, *Lingle* and other circuit cases indicate that the right to exclude is not a "fundamental right" under a substantive due process analysis and that regulations of private property rights are not subject to heightened scrutiny. *See, e.g., Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1015-16 (8th Cir. 2006) (holding, in context of equal protection claim, that statute allegedly interfering with right to acquire, own, and dispose of property did not implicate a fundamental right);[45] *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1580 (10th Cir. 1995) (holding, in context of an equal protection claim, that state regulations restricting property rights, specifically the right to hunt on one's land, are not subject to strict scrutiny and do not implicate fundamental rights); *United States v. 16.92 Acres of Land*, 670 F.2d 1369, 1373 (7th Cir. 1982) (holding, in context of equal protection claim, that "the right to enjoy one's property is subject to the legitimate exercise of eminent domain by the government . . . [and] strict scrutiny is not the proper standard"); *Coalition for Equal Rights, Inc. v. Owens*, 458 F. Supp. 2d 1251, 1263 (D. Colo. 2006) (holding, in context of substantive due process claim, that the "general right to enjoy one's property is not *per se* a fundamental right" such as the right to travel, the right to vote, and the right to procreate). The Amendments do not affect

---

[45] Analysis of whether a right qualifies as a "fundamental right" under the Due Process Clause is the same whether the challenge sounds in equal protection or substantive due process. *See Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 935 (10th Cir. 1989).

a "fundamental right" for purposes of substantive due process analysis, and the Amendments are subject only to rational basis review. *See Clajon*, 70 F.3d at 1580 (applying rational basis review to regulation affecting property rights).[46]

When the rationality of a law is questioned, the decision of the legislature must be upheld if "any state of facts either known or unknown which could reasonably be assumed affords support for [the law]." *Powers*, 379 F.3d at 1216-17. "[R]ational basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question." *Id.* at 1217. A law will not be struck down as irrational "simply because it may not succeed in bringing about the result it seeks to accomplish" or "because the statute's classifications lack razor-sharp precision." *Id.* Nor may a court "overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice." *Id.* Further, a law can survive rational basis review even if the defender of the law has not submitted any evidence supporting its rationality. *See Clajon*, 70 F.3d at 1580 ("[T]he State need not articulate its actual objective behind the scheme or submit evidence to support the rationality of the regulation, provided that we can conceive of facts which reasonably justify the [law] at issue.").

To satisfy the rational basis test, the Amendments need only be rationally related to a legitimate government purpose. *Powers*, 379 F.3d at 1215. The OCCA held that, based on their

---

[46] The ABA Report conversely concludes that the right to exclude is a "fundamental" right and that the Amendments must be subjected to strict scrutiny. (*See* ABA Report at 4-6, Ex. D. to ConocoPhillips Add'l Br. on Preemption Issues.) The Court carefully reviewed all authority cited in the ABA Report. However, this authority merely discusses the importance of the right to exclude within an analysis under the Takings Clause and does not support the proposition that regulations of property rights are subject to heightened review under the substantive component of the Due Process Clause. *See, e.g.*, David L. Callies & J. David Breemer, *The Right to Exclude Others From Private Property: A Fundamental Constitutional Right*, 3 WASH. U. J. L. & POL'Y 39, 52-54 (2000) (cited in ABA Report).

presence within the OFA and OSDA, the 2004 Amendments were criminal laws aimed at protecting "the health, safety, and public welfare of citizens and to deter crime." *Whirlpool Corp. v. Henry*, 110 P.3d 83, 86 (Okla. Crim. App. 2005). The OCCA further held that the 2004 Amendments "concern protection of the community as a whole rather than individual citizens." *Id.* The Court is bound by this ruling in construing the purposes of the 2004 Amendments. *See Burleson v. Saffle*, 278 F.3d 1136, 1144 (10th Cir. 2002) (holding that construction of a state statute by a state court of last resort is binding on federal courts). The Court also finds it appropriate to construe these as the purposes of the 2005 Amendments. Therefore, the government purposes to be served by both the 2004 and 2005 Amendments are (1) to promote public health, safety, and welfare; (2) to deter crime; and (3) to protect the community as a whole.[47] There is no question that promoting public safety, deterring crime, and protecting the community are legitimate government purposes.

In support of the rationality of the Amendments in furthering these objectives, Defendants presented statements made by Oklahoma legislators at the time of passage of the 2005 Amendments indicating that the Amendments promote the goal of public safety by allowing citizens to "arm themselves" in their vehicles. *See, e.g.,* Oklahoma House of Representatives Media Division, *Legislature Approves Gun Owner Protections* (May 27, 2005), *available at* htttp://www.lsb.state.ok.us/HOUSE/news7632.html (quoting Oklahoma State Representative Greg Piatt as stating that "[b]usinesses have no reason to fear law-abiding employees and workers have a right to defend themselves" and that "[w]e all know women that work late nights who would be considered easy prey by criminals if they were not allowed to arm themselves"). Other than these

---

[47] The NRA contends that another purpose of the Amendments is to preserve Oklahomans' ability to hunt. (*See* Br. of *Amicus Curiae* NRA 15.) The Court will not consider this purpose because it was not identified by the OCCA.

statements, Defendants have presented no evidence as to how the Amendments accomplish the three goals articulated above.

Also before the Court is the affidavit of Johnson, the original drafter of the language remaining in both challenged laws, who stated he drafted the law in order to create a public policy tort in the event employees were terminated for keeping firearms in their vehicles on company property.  (Aff. of Author of Subject Statute ¶ 3.)  As evidenced by the OCCA's ruling, Johnson accomplished significantly more than that –  he drafted a statute that criminally prohibits the exclusion of any individuals engaging in the activity of transporting firearms in a locked vehicle. It also extends the prohibition to many types of property owners other than employers.  Thus, to the extent Johnson's statement is considered a type of legislative history, it does not support the proposition that the Amendments increase public safety.  It instead supports the idea that the Amendments were passed to protect employees' right to bear arms on their employers' parking lots.[48]

Also before the Court are empirical studies concluding that carrying firearms outside the home by law-abiding adults actually promotes public safety, which were presented by *amicus* NRA. (*See* Br. of *Amicus Curiae* NRA 10.)[49]  For example, the NRA contends that "defensive gun uses

---

[48]  Legislators' statements also indicate that the 2005 Amendments were passed to protect citizens' right to bear arms.  *See* Oklahoma House of Representatives Media Division, *Legislature Approves Gun Owner Protections* (May 27, 2005), *available at* htttp://www.lsb.state.ok.us/HOUSE/news7632.html (quoting Greg Piatt as stating that "[l]aw-abiding citizens shouldn't have to surrender their freedom – especially the right to protect their lives – because of the actions of criminals" and quoting Jerry Ellis as stating that "[t]his bill isn't about political parties.  It's about principles. This is about our Second Amendment rights and the values of Oklahomans.").

[49]  The NRA assumed, for purposes of its brief, that the Amendments were subject to strict scrutiny and argued that the Amendments were narrowly tailored to serve compelling government
(continued...)

are more effective than any other response for preventing the completion of robberies and assaults" and that "defensive gun users are significantly less likely to be injured during a robbery or assault than victims who respond in any other way." (*Id*.) The NRA's conclusions are based on statistical studies presented in various law review articles. *See, e.g.,* Florenz Plassmann & Nicholas Tideman, *Does the Right to Carry Concealed Handguns Deter Countable Crimes?  Only a Count Analysis Can Say*, 44 J.L. & ECON. 771, 796 (2001) (presenting statistical analysis and concluding that "'right to carry' laws do not always have the deterrent effect on crime . . . [but that] it would be imprudent to make it generally more difficult for law-abiding citizens to carry concealed handguns"); Gary Kleck & Marc Gertz, *Armed Resistance to Crime:  The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995) (presenting statistical analysis and concluding that "prohibitionist measures . . . would therefore discourage and presumably decrease the frequency of [defensive gun use] among noncriminal crime victims").

Considering the evidence presented in support of the Amendments, the Court first observes that the Amendments would likely not survive any degree of heightened scrutiny.  They force property owners to allow potentially dangerous weapons on their private property in order to *increase* public safety and deter crime.  As a matter of common sense, and as argued by Plaintiffs, an increased number of firearms in vehicles on private property would logically lead to an overall decrease in public safety.  Former Tulsa Police Chief Dave Been ("Been"), who was acting chief at the time the Amendments were passed, submitted his opinion that "[t]he presence of firearms in a locked vehicle on an employer's parking lot increases the risk of workplace violence." (*See* Aff.

---

[49](...continued)
interests.  Although the Court concluded a lesser test was appropriate, the evidence provided is also relevant to rational basis review.

of Dave Been, Ex. 2 to App. of Materials Submitted in Support of Plf.'s Mot. for TRO and/or

Prelim. Inj., at ¶ 6.)  In addition, the Amendments force property owners to allow firearms on

property without regard to the type of establishment on that property.  For example, the

Amendments force allowance of firearms on parking lots of the following types of establishments:

mental health care facilities, resulting in a risk of harm to patients and all employees; day care

facilities, resulting in a risk of harm to children;[50] state and federal courthouses, resulting in a risk

of harm to individuals involved in the criminal justice system;[51] and battered women's shelters,

resulting in a risk of further harm to victims of domestic violence.  These problematic examples

demonstrate how and to what extent the Amendments create danger to particularly vulnerable

Oklahomans under the guise of promoting public safety and deterring crime.  In addition, a plain

reading of the Amendments could lead to the illogical conclusion that general "no trespassing"

policies are prohibited by the Amendments because such policies have the specific effect of

excluding the segment of the population covered by the Amendments – those carrying firearms in

their locked vehicles.  For example, a gated residential community that sought to exclude all types

of trespassers may illogically be forced to allow the trespass of an individual, if that individual is

---

[50]  As discussed *supra* note 29, the Oklahoma Attorney General has declared that the Amendments do not apply to Oklahoma schools because the Amendments are superseded by specific Oklahoma laws prohibiting possession of firearms on school property, found at Title 70, Section 24-101.3 and Title 21, Section 1280.1 of the Oklahoma Statutes.  *See* 2004 OK AG 39 (Dec. 7, 2004).  However, the definition of "school property" is limited to property "held for purposes of elementary, secondary or vocational-technical education" and makes no mention of day care facilities.  *See* OKLA. STAT. tit. 21, § 1280.1(B).

[51]  Many Oklahoma state and federal courthouses, such as the federal building housing this Court, have underground parking areas.  These areas are "propert[ies] set aside for any vehicle" pursuant to the Amendments.  *See* Okla. Stat. tit. 21, § 1290.22(B).  The Amendments' forced imposition of weapons in underground parking areas poses an even greater danger because the "property set aside for any vehicle" is actually part of, rather than merely adjacent to, the courthouse.

61

carrying a firearm in his locked vehicle. The Amendments are not tailored to achieve their objectives of promoting safety of Oklahoma citizens. However, for reasons explained above, this Court has no opportunity to conduct heightened means-end scrutiny of the Amendments.[52] Instead, the Court must apply the extremely deferential rational basis standard, which inquires only if the laws are "rational" and excuses Defendants from making a persuasive evidentiary case in support of the rationality of the Amendments.

Based on Defendants' limited evidence in support of rationality, which includes statements by Oklahoma legislators at the time of passage of the 2005 Amendments and statistical studies provided by the NRA, it is at least conceivable that the Oklahoma Legislature made a determination that the forced invasion of guns on private property increases safety for the community because such guns may be used by the vehicle owner for defensive purposes. Although it is a close case and the rationality of the Amendments is questionable, the Court cannot conclude the Amendments are "wholly irrational" or "arbitrary" methods of accomplishing the objectives identified by the OCCA. *Powers*, 379 F.3d at 1217 ("[R]ational basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question."). Accordingly, the Amendments must survive a rational basis review.[53]

_____

[52] The Supreme Court's *Lingle* decision overruled the "substantially advances" test under the Takings Clause, *see supra* note 34, and there is no basis to conclude the right to exclude is a fundamental right under the Substantive Due Process Clause.

[53] As a general rule, "[d]ue process protections encompassed within article 2, section 7 of Oklahoma's constitution are coextensive with those of its federal counterpart." *Presley v. Bd. of Cty. Comm'rs* of Okla. City, 981 P.2d 309, 312 (Okla. 1999). In the specific context of a regulation affecting property rights, the Oklahoma Supreme Court has approved a jury instruction that required a plaintiff to prove a highway improvement project was an "arbitrary, capricious, or unreasonable exercise of the State's police powers insofar as ingress or egress is concerned." *See Suntide Inn Operating Corp. v. State ex rel. Okla. State Highway Comm'n*, 571 P.2d 1207, 1209 (Okla. 1977). (continued...)

**V.      Supremacy Clause Challenge - OSH Act Preemption**

**A.      General Preemption Principles**

Congress has the power to preempt state law under Article VI,  Clause 2  of the Supremacy

Clause of the U.S. Constitution.  *See Choate v. Champion Home Builders*, 222 F.3d 788, 791 (10th

Cir. 2000).  Federal law preempts state law in three circumstances:

> "First, Congress can define explicitly the extent to which its
> enactments pre-empt state law. Pre-emption fundamentally is a
> question of congressional intent, and when Congress has made its
> intent known through explicit statutory language, the courts' task is
> an easy one.  Second, in the absence of explicit statutory language,
> state law is pre-empted where it regulates conduct in a field that
> Congress intended the Federal Government to occupy exclusively.
> Such an intent may be inferred from a scheme of federal regulation
> . . . so pervasive as to make reasonable the inference that Congress
> left no room for the States to supplement it, or where an Act of
> Congress touch[es] a field in which the federal interest is so dominant
> that the federal system will be assumed to preclude enforcement of
> state laws on the same subject. . . . Where . . . the field which
> Congress is said to have pre-empted includes areas that have been
> traditionally occupied by the States, congressional intent to supersede
> state laws must be clear and manifest.   Finally, state law is
> pre-empted to the extent that it actually conflicts with federal law.
> Thus, the Court has found pre-emption where it is impossible for a
> private party to comply with both state and federal requirements, or
> where state law stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress."

*Id.* at 791-92 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990)).  These three types of

preemption are known as express preemption, field preemption, and conflict preemption.  *Id.*  The

"ultimate task in any pre-emption case is to determine whether state regulation is consistent with the

structure and purpose of the [federal] statute as a whole."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,

---

[53](...continued)
Accordingly, the Court's Substantive Due Process Clause analysis extends equally to the Oklahoma
Constitution.

505 U.S. 88, 98 (1992).  In completing this task, a court must "look[] to the provisions of the whole [federal] law, and to its object and policy."  *Id.* (quotation omitted).

### B.      OSH Act's Purpose and General Duty Clause

Plaintiffs contend the Amendments are preempted as in conflict with the OSH Act's purposes, *see* 29 U.S.C. § 651(b),  and the OSH Act's "general duty" clause, *see* 29 U.S.C. § 654(a)(1).  The OSH Act's purpose clause provides:

> (b)  The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation have *safe and healthful working conditions and to preserve our human resources* –
>
>      (1) by *encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards* at their places of employment, and to *stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions* . . . .

29 U.S.C. § 651(b)(1) (emphasis added).  Thus, the OSH Act aims to promote safe and healthful working conditions, to preserve human resources, and to encourage employers to institute programs and policies aimed at increasing workplace safety.

In addition to these overall objectives, employers are charged with general and specific duties:

> (a) Each employer –
>      (1) *shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees*;
>      (2) shall comply with occupational safety and health standards promulgated under this chapter.

29 U.S.C. § 654(a) (emphasis added).  The first subpart of 29 U.S.C. § 654(a) is known as the "general duty" clause.  *See Teal v. E.I. Dupont de Nemours & Co.*, 728 F.2d 799, 803 (6th Cir.

64

1984).  The duty imposed by § 654(a)(1) is considered "general" because "it asks employers to protect employees from all kinds of serious hazards, regardless of the source."  *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 982 (7th Cir. 1999).  The "general duty" clause is a stand-alone obligation with which employers must comply.  It is in addition to the "specific duty" clause in § 654(a)(2), which requires compliance with the numerous OSH Act regulations promulgated to prevent specific workplace hazards.  *See Safeway, Inc. v. Occupational Safety & Health Review Comm'n*, 382 F.3d 1189, 1194 (10th Cir. 2004) ("The plain language of the statute and its structure indicate that an employer's duty to provide a safe working environment extends beyond compliance with specific safety and health standards that are included in regulations promulgated under the [OSH Act].").  The purpose of the general duty clause is to be a catch-all provision covering serious hazards that are not otherwise covered by regulations:

> The general duty clause was intended by Congress to cover unanticipated hazards; Congress recognized that it could not anticipate all of the potential hazards that might affect adversely the safety of workers.  Accordingly, it enacted the general duty clause to cover serious hazards that were not otherwise covered by specific regulations.

*Teal*, 728 F.2d at 804.  In contrast to duties owed pursuant to the specific duty clause, which are necessarily defined by "reference to [an employer's] control of the workplace and opportunity to comply with the OSHA regulations," duties owed pursuant to the general duty clause are much broader:

> [E]very employer owes a duty of reasonable care to protect his employees from recognized hazards that are likely to cause death or serious bodily injury.  The protection from exposure to serious hazards is the primary purpose of the general duty clause, and *every employer owes this duty regardless of whether it controls the workplace, whether it is responsible for the hazard, or whether it has the best opportunity to abate the hazard.*

65

*Id.* (emphasis added).

Employers are subject to citation by the Secretary of Labor for violation of the general duty clause, just as employers are subject to citation for violation of specific OSH Act regulations. *See Baroid Div. of NL Ind., Inc. v. Occupational Safety & Health Review Comm'n*, 660 F.2d 439 (10th Cir. 1981) (reviewing Secretary of Labor's citation of employer for violation of general duty clause). Significantly, courts have construed an employer's duties under the general duty clause to extend to the prevention of harm caused by fellow employees. For example, the Seventh Circuit has stated:

> We note, first, that if an employee is negligent or creates a violation of a safety standard, that does not necessarily prevent the employer from being held responsible for the violation. True, an employer is not an insurer under the Act. But an employer is responsible if it knew or, with the exercise of reasonable diligence, should have known of the existence of a serious violation. A particular instance "of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous nature, at the moment of its occurrence, . . . (where) such conduct might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees."

*Brennan v. Butler Lime & Cement Co.,* 520 F.2d 1011, 1017 (7th Cir. 1975) (citations omitted) (quoting *Nat'l Realty & Constr. Co. Inc. v. Occupational Safety & Health Review Comm'n*, 489 F.2d 1257, 1260 n.6, 1266-67 n.37 (D.C. Cir. 1973)). Accordingly, the general duty clause clearly places the onus on the employer to prevent hazards that could lead to death and serious bodily harm, even when such hazards are not covered by specific OSH Act regulations, when the employer is not responsible for creating the hazard, and when the employer is not in the best position to abate the hazard.

C.    ***Gade* Preemption**

Plaintiffs rely on the Supreme Court's decision in *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992), as authority that the Amendments are preempted

by the overall purposes and general duty clause of the OSH Act.  (*See* ConocoPhillips' Add'l Brief on Preemption Issues 10-14.)  The *Gade* Court held that Congress intended the OSH Act to wholly preempt *all* "state regulation[s] of an occupational safety or health issue with respect to which a federal standard has been established," even when the state regulation is nonconflicting or stricter than the federal standard.  *Id.* at 100 (holding that state law providing a stricter standard than the OSH Act standard was preempted).  This holding was based on the "negative implications" of the OSH Act's savings clause, which is set forth at 29 U.S.C. § 667(a).  *Gade*, 505 U.S. at 104 n.2.  The savings clause states that "[n]othing in this subchapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue for which no standard is in effect under section 655 of this title."  29 U.S.C. § 667(a).[54]  Because the Supreme Court's holding was based on the "negative implications" of the savings clause, a plurality of the Court was unwilling to base their holding on the doctrines of express or field preemption.  *Gade*, 505 U.S. at 104 n.2.  Instead, the plurality chose to label its decision as one based on "obstacle" conflict preemption.  The Court acknowledged, however, that it "could as easily have stated that the promulgation of a federal safety and health standard 'pre-empts the field' for any nonapproved state law regulating the same safety and health issue."  *Id.*[55]

---

[54]  Section 655, referenced in the savings clause, is entitled "standards" and governs promulgation by the Secretary of "national consensus standards and established Federal standards." 29 U.S.C. § 655. There are many OSH Act "standards" governing specific workplace conduct that have been promulgated pursuant to 29 U.S.C. § 655.  *See, e.g.*, 29 C.F.R. § 1910.120(e)(3)(I) (requiring that workers engaged in an activity that may expose them to hazardous wastes receive a minimum of forty hours of instruction off the site and a minimum of three days actual field experience under the supervision of a trained supervisor).

[55]  In this Court's view, the holding in *Gade* is most easily understood as a type of field preemption.  *See Indus. Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1311 (9th Cir. 1997) ("[A]s interpreted by *Gade*, when OSHA promulgates a federal standard, that standard totally occupies the

(continued...)

The Supreme Court also held that *Gade* preemption applies even if the state law at issue has a purpose other than or in addition to workplace health and safety.  *Id.* at 105-08.  In *Gade*, the Court addressed a "dual impact regulation" – one that addressed general public safety as well as occupational safety concerns.  Specifically, the law at issue in *Gade* provided for training, testing, and licensing of hazardous waste site workers and had the stated purposes of "promot[ing] job safety" as well as "protect[ing] both workers and the general public."  *Id.* at 91.  In this situation, the Court held that a dual-impact state law was still preempted so long as it "directly, substantially, and specifically regulates occupational safety and health" in addition to accomplishing other purposes.  *Id.* at 107.

The Court concludes the Amendments do not qualify for *Gade* preemption for two reasons. First, the Amendments are not state law requirements that "specifically" regulate occupational safety and health.  *See id.*  Instead, the Amendments are merely "state laws of general applicability (such as laws regarding traffic safety or fire safety)  . . . that regulate the conduct of workers and nonworkers alike."  *Id.*  Although the Amendments have a direct effect on workplace safety and although they were originally drafted for the primary purpose of preventing employers from prohibiting firearms from their property, there can be no question that the "forced invasion" of firearms extends to property owners other than employers.  *See* OKLA. STAT. tit. 21, §§ 1289.7a; 1290.22.  In addition, the OCCA interpreted the Amendments' purposes as generally promoting safety and deterring crime for all citizens, rather than promoting the safety of Oklahoma's workers.

---

[55](...continued)
field within the 'issue' of that regulation and preempts all state occupational safety and health laws relating to that issue, conflicting or not, unless they are included in the state plan").  However, because the *Gade* Court could not agree on the proper label, this Court refers to the type of OSH Act preemption addressed in *Gade* as simply "*Gade* preemption."

*See Whirlpool Corp.*, 110 P.3d at 85.  The Amendments are therefore distinguishable from the dual-purpose regulation at issue in *Gade*, which was at least partially aimed at occupational safety by its stated purposes.  *See Gade*, 505 U.S. at 91 (one of stated purposes of Illinois law was "promot[ing] job safety").

Second, the alleged conflict in this case is with the OSH Act's overall purpose and its general duty clause, rather than a "standard" promulgated pursuant to 29 U.S.C. § 655.  As explained above, the general duty clause is set forth in 29 U.S.C. § 654 and is distinct from a specific OSH Act "standard" as that term is used in 29 U.S.C. § 667(a).  Courts have indicated that the OSH Act's general duty clause is not a § 655 "standard."  *See Wilcox v. Niagra of Wis. Paper Corp.*, 965 F.2d 355, 366 n.* (7th Cir. 1992) (Cummings, J., concurring) ("This Court has not held that the 'general duty clause' . . . is a 'standard' that preempts state law."); *Puffers Hardware, Inc. v. Donovan*, 742 F.2d 12, 16-17 (1st Cir. 1984) (finding that, in case in which an employer was cited for violation of the general duty clause, "no federal standard govern[ed] the conduct at issue"); *Traudt v. Potomac Elec. Power Co.*, 692 A.2d 1326, 1332 (D.C. App. 1997) (stating that the general duty clause is not a 'standard' promulgated under § 655"); Note, Xavier K. McDonnell, *Criminal Liability for Workplace Accidents*, 24 NEW ENG. L. REV. 293, 325 n.269 ("This section [§ 667(a)] only preempts state jurisdiction over standards which are promulgated" and "does not preempt violations of the general duty clause"); *see also P&Z Co., Inc. v. District of Columbia*, 408 A.2d 1249, 1250-51 (D.C. App. 1979) (stating that term "standard" as used in statutory preemption sections of the OSH Act is a "word of art" that applies "only to standards promulgated by rule under § 655").  The preemption subsections of the OSH Act, which function to preempt all state laws for which there is a federal "standard" in effect, do not extend to the general duty clause.  Therefore, the Amendments are not preempted based on *Gade* preemption.

69

The Court concludes, however, that this does not end the preemption analysis.  In addition to considering *Gade* preemption (which in many ways is most like the traditional concepts of express or field preemption), the Court must also consider conflict preemption as a possible basis for preemption by the OSH Act.  *See Gade*, 505 U.S. at 107 (indicating that state laws that are "conflicting" with the OSH Act may still be preempted, even if the state laws are ones of general applicability and would not be preempted based on *Gade* preemption); *In re Welding Fume Prod. Liab. Litig.*, 364 F. Supp. 2d 669, 678 (N.D. Ohio 2005) ("Thus, even when Congress states expressly what aspects of state law it means to pre-empt, courts must still infer pre-emption beyond the confines of Congress's statements if state law actually conflicts with federal law. And this inference is appropriate even 'in light of the presumption against the pre-emption of state police power regulations.'"); *Gonzalez v. Ideal Tile Importing Co.*, 877 A.2d 1247, 1253 (N.J. 2005) (analyzing whether common law products liability claim was preempted based on obstacle conflict preemption after concluding *Gade* preemption did not apply); *see generally Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) ("Congress' inclusion of an express pre-emption clause does not bar the ordinary working of conflict pre-emption principles that find implied pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (quotations omitted).

The Court further concludes that the OSH Act's general duty clause and/or the OSH Act's overall purposes can function to preempt state law in cases of actual conflict therewith, *i.e.*, when state law makes it impossible or poses a significant obstacle to compliance.  In the only circuit decision found addressing whether a state law was preempted by the OSH Act's general duty clause, the court first analyzed whether the language of 29 U.S.C. § 667(a) functioned to preempt the state

law and then proceeded to analyze whether the state law "actually conflicted" with the general duty clause or the overall federal objectives of the OSH Act. *See Puffers Hardware, Inc. v. Donovan*, 742 F.2d 12, 16-17 (1st Cir. 1984) ("Since no federal standard governs the conduct at issue in this case, it is clear that the [state] statute is not preempted as a result of federal occupation of the field of elevator safety . . . . Further, we do not believe that there is any actual conflict between federal and state law."). Although *Puffers Hardware* was decided before *Gade*, the Court finds nothing in *Gade* to indicate that state law can never be preempted based on conflict with the general duty clause or the OSH Act's overarching purpose. *See Gade*, 505 U.S. at 107 (explaining when a court may find preemption of "nonconflicting" state laws). Obviously, the general duty clause cannot function to preempt *every* state law addressing a matter that is also covered by the general duty clause, as could an OSH Act "standard." This does not mean, however, that a state law cannot "actually conflict" with the general duty clause. Although not a technical "standard," the general duty clause is a vital component of the OSH Act's overall objective of promoting safety in the workplace because it obligates employers to prevent hazards that could lead to death or serious bodily harm. The Court therefore finds Congress intended to preempt state laws that conflict with the general duty clause or with the OSH Act's overall purposes.

### D.    Conflict Preemption

"Conflict preemption includes both situations in which it is impossible for a private party to comply with both state and federal requirements and situations in which state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Choate*, 222 F.3d at 792 (quotations omitted). The Court will refer to the first type of conflict preemption as "impossibility conflict preemption" and the second type as "obstacle conflict preemption."

71

Impossibility conflict preemption applies if "it is impossible for a private party to comply with both state and federal requirements." *Id.* For example, impossibility conflict preemption would occur if a federal law "forbade the picking and marketing of any avocado testing more than 7% oil" while a state law "excluded from the State any avocado measuring less than 8% oil content." *See Florida Lime & Avocado Growers, Inc.*, 373 U.S. 132, 142 (1963). Under the general duty clause, an employer must "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(1). To support a finding that an employer has violated the general duty clause, the Secretary of Labor must meet a three-part test: "(1) that a hazard likely to cause death or serious bodily harm existed at a citable workplace; (2) that that hazard was recognized as such either by the cited employer or generally within the industry; and (3) that there was a feasible method by which the cited employer could have abated the 'recognized hazard.'" *Baroid Div. of NL Ind., Inc.*, 660 F.2d at 444. The question is whether the Amendments render compliance with the general duty clause "impossible." In other words, the question is whether the allowance of firearms in vehicles would, in every instance, result in a citation under the general duty clause when such firearms led to the death or serious injury of an employee.

The Amendments come very close to making it "impossible" for Plaintiffs and other Oklahoma employers to comply with the general duty clause. For reasons explained in more detail below, the Court finds that gun-related workplace violence and the presence of unauthorized firearms on company property qualify as "hazards that are causing or are likely to cause death or serious physical harm" under the general duty clause. The Amendments eliminate Plaintiffs' chosen method of abating such hazards. However, the Occupational Safety and Health Administration ("OSHA") has indicated that whether a particular instance of workplace violence will result in a

violation of the general duty clause is a fact-specific inquiry that depends on the nature of the employer's business and the surrounding circumstances.  *See* Standard Interpretations Letter, Dec. 10, 1992, *available at* www.osha.gov/SLTC/workplaceviolence/standards.html ("Whether or not an employer can be cited for a violation of [the general duty clause] is entirely dependent on the specific facts . . . .  The recognizability and foreseeability of the hazard, and the feasability of the means of abatement, are some of the critical factors to be considered."); *Megawest Fin., Inc.*, OSHRC Docket No. 93-2879, 1995 OSAHRC Lexis 80 (May  8, 1995) (refusing to uphold general duty clause citation by Secretary of Labor where employer failed to take security measures to "minimize or eliminate employee exposure to assault and battery by tenants of the apartment complex" because the hazard was not sufficiently "recognized" by the employer in that instance).  At this juncture, OSHA has not taken the final step and expressly required employers to enact "no firearms" policies in order to be in compliance with the general duty clause.  Therefore, the Court cannot conclude the Amendments render compliance with the general duty clause "impossible" in every instance of a gun-related workplace injury.[56]

The Court must also consider obstacle conflict preemption.  "In obstacle preemption cases federal law does not completely occupy a field of law, nor does state law require an act that federal

_____

[56] The Court's holding in this case should therefore not be read to impose OSH Act liability on employers in the event of gun-related injuries or accidents.  Nor should it be read to require all Oklahoma employers to enact policies similar to Plaintiffs in order to be in compliance with the OSH Act.  Instead, the Court holds that the Oklahoma Legislature's attempt to disallow employers from choosing to abate the hazards of gun-related workplace violence and unauthorized firearms on company property must be enjoined because the Amendments stand as an obstacle to complying with the general duty clause and accomplishing the OSH Act's purposes.  This Court agrees with the author of the Brady Center Article who stated that it is "likely a breach of OSHA's general duty clause if a company does not ban guns from its premises . . . because guns can be easily retrieved from such areas by disgruntled employees."  *See* Brady Center Article, *supra* note 4, at 5.  However, a "likely" breach is not sufficient for a finding of impossibility conflict preemption.

law forbids (or vice-versa), but state law instead impedes some policy or purpose of a federal statute or regulation." *Mgmt. Ass'n for Private Photogrammetric Surveyors v. United States*, 467 F. Supp. 2d 596, 603-04 (E.D. Va. 2006). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  In order for obstacle preemption to apply, the state action must be a "material impediment" to the federal action or must "thwart [] the federal policy in a material way." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir. 1998).  It is not relevant whether the state had a purpose in mind other than frustration of the federal scheme.  *See Perez v. Campbell*, 402 U.S. 637, 651 (1971) (holding that state law frustrating operation of federal law will be preempted even though state legislature had significant purpose in mind other than frustration).

The Supreme Court has affirmed the importance and relevance of obstacle conflict preemption within a preemption analysis:

> The Court has not previously driven a legal wedge — only a terminological one – between "conflicts" that prevent or frustrate the accomplishment of a federal objective and "conflicts" that make it "impossible" for private parties to comply with both state and federal law. Rather, it has said that both forms of conflicting state law are "nullified" by the Supremacy Clause . . . and it has assumed that Congress would not want either kind of conflict.

*Geier v. Am. Honda Motor Co., Inc.*,  529 U.S. 861, 873 (2000).  Further, the Supreme Court has found obstacle preemption to exist in a variety of contexts in which a state law posed an obstacle to accomplishment of the purposes of federal law.  *See, e.g.*, *id.* (holding that rule of state tort law imposing a duty that would have required installation of airbags rather than passive restraint systems "presented an obstacle to the variety and mix of devices that the federal regulation sought" and "could have made less likely the adoption of a state mandatory 'buckle-up' law"); *Boggs v. Boggs*,

520 U.S. 833 (1997) (holding that state community property law that interfered with objectives of ERISA was preempted based on obstacle preemption); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) (holding that Vermont nuisance law permitting common law suits that had the potential to undermine regulatory structure and objectives of Clean Water Act was preempted based on obstacle preemption); *Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461 (1984) (holding that Michigan agricultural law establishing accredited "associations" and requiring nonmember growers to adhere to contracts negotiated by the growers' association conflicted with Federal Agricultural Fair Practices Act insofar as it enabled producers' associations to determine the prices individual growers would receive for their products and was therefore preempted based on obstacle conflict preemption).

The Court finds the Amendments are preempted based on obstacle conflict preemption. Because this Court is the first to address whether these types of laws stand as an obstacle to the OSH Act, the Court sets forth detailed reasoning below.  First, the Court finds the general duty clause extends to the hazard of gun-related workplace violence.  Second, the Court finds the Amendments pose a material impediment to compliance with the general duty clause and also thwart the overall purposes and objectives of Congress in passing the OSH Act.

### 1.    General Duty Clause Extends to Injuries Caused by Workplace Violence

Even in light of the broad obligations imposed by the general duty clause, the Court initially had concerns as to whether an employer's obligations under the general duty clause extend to the prevention of workplace violence and, in particular, workplace violence committed with firearms. After review of various published materials discussing the OSH Act and workplace violence, the Court is convinced the OSH Act's general duty clause extends to potential dangers posed by

unauthorized firearms on company property and, specifically, the danger of workplace violence committed against employees.

First, in *Megawest Financial, Incorporated*, OSHRC Docket No. 93-2879, 1995 OSAHRC Lexis 80 (May 8, 1995), an employer was cited by the Secretary of Labor for violation of the general duty clause for failing to take security measures to "minimize or eliminate employee exposure to assault and battery by tenants of the apartment complex" after a tenant who was refused her security deposit sprayed mace at the apartment managers. *Id.* at *5. The Administrative Law Judge ("ALJ") determined that failure to provide a workplace free of violence could in fact constitute a violation of the general duty clause under the OSH Act but noted that "a high standard of proof must be met to show that the employer itself recognized the hazard of workplace violence." *Id.* at *29. The ALJ vacated the citation in that case, finding that the hazard was not "recognized" by the employer. *Id.* at *32. Although it was not ultimately upheld by the ALJ, the Secretary of Labor issued the citation. This reveals that the general duty clause extends to injuries inflicted upon employees with weapons during a violent incident on company property. *See also Psychiatric Hospital in Chicago Cited by OSHA for Workplace Violations*, 23 O.S.H. Rep. (BNA) 646 (1993) (explaining that hospital was cited for violation of general duty clause for failing to protects employees from workplace violence).

Second, on the OSHA website, there is a specific page devoted to the topic of "workplace violence." This page provides:

> Violence in the workplace is a serious safety and health issue. Its most extreme form, homicide, is the fourth-leading cause of fatal occupational injury in the United States. According to the Bureau of Labor Statistics Census of Fatal Occupational Injuries (CFOI), there were 551 workplace homicides in 2004 in the United States, out of a

> total of 5,703 fatal work injuries.[57]   Environmental conditions associated with workplace assaults have been identified and control strategies implemented in a number of work settings.   OSHA has developed guidelines and recommendations to reduce worker exposures to this hazard but is not initiating rulemaking at this time.[58]

(*See* OSHA Website Materials, Ex. C to ConocoPhillips Add'l Br. on Preemption Issues (footnotes added).)   After explaining the problem of workplace violence, the OSHA website then directs readers to a page answering the question, "What OSHA standards apply?"   This page, entitled "Workplace Violence: OSHA Standards," sets forth the "general duty" clause found in § 654(a)(1) as the standard of compliance for preventing workplace violence, indicating to employers that workplace violence is indeed covered by the general duty clause.   (*See id.*)

Third, OSHA has enacted voluntary guidelines dealing with workplace violence in night retail establishments and the health care and social service fields.   *See* OSHA Guidelines for Preventing Workplace Violence Among Health Care and Social Service Workers, 25 O.S.H. Rep. (BNA) 1439, 1440 (March 13, 1996); OSHA Guidelines for Workplace Violence Prevention Programs for Night Retail Establishments, 15 O.S.H. Rep. (BNA) 1591, 1591 (Apr. 15, 1996).   The guidelines related to health care and social service workers expressly mention "[t]he prevalence of handguns and other weapons among patients, their families or friends" as a "risk factor" leading to an increased risk of work-related assaults.   *See* OSHA Guidelines for Preventing Workplace

---

[57]   For purposes of this case, these statistics cited by the DOL have meaning only if they are tied to firearms, *i.e.*, if a significant number of homicides were deaths by shooting.   Therefore, the Court has analyzed the Bureau of Labor statistics to determine what percentage of workplace homicides were gun related.   As expected, the percentage is high.   In 2004, the year cited on the OSHA website, approximately 75% of homicides were "homicides by shooting."   *See* Bureau of Labor Statistics, U.S. Dep't of Labor, National Census of Fatal Occupational Injuries (2005).   In 2005, approximately 77% of homicides were "homicides by shooting."   *Id.*

[58]   These guidelines, which are discussed below, apply to night retail establishments and the health care and social service fields.

Violence Among Health Care and Social Service Workers, 25 O.S.H. Rep. (BNA) 1439, 1440 (March 13, 1996).  While these voluntary guidelines are not considered OSH Act "standards," they evidence that workplace violence is within the scope of the OSH Act and that OSHA has offered specific suggestions for reducing workplace violence at certain establishments.

Fourth, OSHA has issued "standard interpretation" letters that are informative as to the OSH Act's reach into the area of workplace violence.  The first letter issued regarding an employer's obligations to prevent workplace violence under the general duty clause states that "[w]hether or not an employer can be cited for a violation of [the general duty clause] is entirely dependent on the specific facts . . . .  The recognizability and foreseeability of the hazard, and the feasability of the means of abatement, are some of the critical factors to be considered."  *See* Standard Interpretations Letter, Dec. 10, 1992, *available at* www.osha.gov/SLTC/workplaceviolence/standards.html. After promulgation of the voluntary guidelines for night retail establishments in 1996, OSHA responded to an inquiry from a U.S. Congressman regarding whether the guidelines imposed a heightened standard of care for employers.  This response stated that "whether or not [voluntary] guidelines exist," an employer is always subject to the legal requirements of the general duty clause.  *See* Standard Interpretations Letter, Oct. 23, 1996, *available at* www.osha.gov/SLTC/workplaceviolence/standards.html.   The response further stated that, while the guidelines offer suggested methods for abatement of the hazard of workplace violence, the "employer is always free to choose his own method of abatement" in complying with the general duty clause.  *Id.*  These statements establish that the general duty clause is an overarching obligation extending to all employers with respect to workplace violence.  The absence of guidelines related to all specific industries does not diminish an employer's obligation under the general duty clause

78

to identify hazards that could lead to death or serious bodily harm and to abate them through their chosen methods.[59]

Fifth, in addressing the effect of concealed weapons legislation on the workplace, commentators have opined that employers must be able to enact "no firearm" policies such as those enacted by Plaintiffs in order to comply with the OSH Act.  *See* A. Nicole Hartley, Comment, *Business Owner Liability and Concealed Weapons Legislation: A Call for Legislative Guidance for Pennsylvania Business Owners*, 108 PENN ST. L. REV. 637, 646 (2003) [hereinafter *Business Owner Liability*] (concluding that "[i]f OSHA recognizes workplace violence, then employers who prohibit weapons could be eliminating foreseeable hazards"); *Gun For Hire, supra* (arguing that employers' policies prohibiting weapons are reasonable and permissible even when they are contrary to rights given to citizens by concealed weapons legislation due, in part, to an employer's obligations under the OSH Act).  One commentator concluded:

> Given the current workplace violence statistics, it does not require a great leap of imagination to conclude that allowing employees to bring weapons into the workplace, even lawfully, would increase the potential hazard of workplace violence.  Moreover, a cogent argument could be made that such hazards are now objectively "recognizable," and therefrom, employers are on notice of the hazard of workplace violence in light of the recent publication of various statistics as well as the promulgation of OSHA guidelines. . . . Therefore, employers can reasonably adopt policies of prohibiting concealed weapons in the workplace predicated upon the employer's legal duty to provide a safe workplace for employees.

---

[59]  Although not relevant to obligations under the general duty clause, another standard interpretation letter regarding record-keeping obligations is informative regarding whether the OSH Act generally extends to violence occurring in an employee parking lot.  In this letter, OSHA stated: "The recordkeeping regulation contains no general exception for purposes of determining work-relationship for cases involving acts of violence in the work environment.  Company parking lots/access roads are part of the employer's premises and therefore part of the employer's establishment. "  *See* OSHA Std. Interp. 1904, 2004 WL 3320215 (Jan. 15, 2004).

*Id.* at 310.  Although these articles discuss general concealed weapons legislation, which presumably allows employees to bring firearms inside places of business and not merely in locked vehicles in the parking lots, their conclusions that gun-related workplace violence should be considered a "recognizable hazard" under the OSH Act's general duty clause is instructive.  *See also* Nicole Buonocore Porter, *Victimizing the Abused?: Is Termination the Solution When Domestic Violence Comes to Work?*, 12 MICHIGAN J. OF GENDER AND L. 275, 315-16 (1996) (concluding that OSHA standard interpretation letters and initiatives suggest that "an employer must take steps to decrease workplace violence if it wants to avoid the risk of being found in violation of OSHA" and stating that "[g]iven the emerging and very public reports about the prevalence of domestic violence at the workplace, an employer would be hard pressed to explain why such violence was not foreseeable and remediable under the statute"); *see generally* Amy D. Whitten & Deanne M. Mosley, *Caught in the Crossfire:  Employers' Liability for Workplace Violence*, 70 MISS. L. J. 505, 507 (2000) ("Beginning with an employer's 'general duty' under OSHA to provide a safe and healthful workplace . . . the employer owes a duty to its employees."); Brady Center Article, *supra* note 4, at note 54 (listing numerous articles and studies documenting the "serious problems of workplace violence").

Finally, case law in the area of arbitration awards is instructive as to the impact of the general duty clause on gun-related workplace violence.  In addressing whether to reverse arbitration awards that were entered in favor of employees who committed acts of workplace violence, courts have found OSHA's general duty clause to establish a well-defined "public policy" against workplace violence, such that the arbitration awards may be reversed.  In *G.B. Goldman Paper Company v. United Paperworkers International Union, Local 286*, 957 F. Supp. 607 (E.D. Pa. 1997), the court addressed the question of whether reinstatement of a violent employee violated a public policy of

workplace safety.  *Id.* at 617.  The court first cited the general duty clause of the OSH Act as establishing a "well defined and dominant" public policy of workplace safety.  *Id.* at 618.  The court noted:

> Workplace violence has become an increasingly more prominent concern to employers around the country in recent years.  In 1994, there were 1071 workplace homicides, totalling sixteen (16) percent of the 6588 fatal work injuries.  Concern about violence in the workplace prompted the Labor Department in March 1996 under OSHA to issue guidelines to prevent and reduce workplace violence in health care and social service industries-where almost two-thirds of all nonfatal workplace violence occurs . . . . Furthermore, local governments have begun to implement programs to reduce and prevent violence in the work environment.  That the matter of workplace safety has prominently manifested itself on federal and local agendas indicates that safety in the work environment has become a well-defined and dominant public policy that this court should recognize.

*Id.* (citations omitted).  Similarly, in *United States Postal Service v. National Association of Letter Carriers*, 839 F.2d 146 (3d Cir. 1988), the Third Circuit evaluated a district court's vacation of an arbitration award in favor of an employee who had fired a gun at his supervisor's car in the employer's parking lot.  The district court reversed the arbitration award on grounds that the decision violated the public policy of workplace safety.  *Id.* at 148.  The Third Circuit reversed the district court on the merits of the case but affirmed the district court's conclusion that there is an indisputable public policy against permitting an employee to direct physical violence at a superior.  *Id.*  These arbitration cases are instructive as to the well-defined public policy created by the OSH Act's general duty clause in favor of workplace safety, which includes prevention of workplace violence occurring on company parking lots.[60]

_____

[60] For additional stating authority that "[c]riminal acts of violence have been recognized by [OSHA] as one of the hazards employers must guard against," see Brady Center Article, *supra* note

(continued...)

2.      **Amendments Materially Impede Ability to Comply with General Duty Clause and Thwart Federal Objective of Promoting Workplace Safety**

The Amendments provide:

> No person, property owner, tenant, employer, or business entity shall *maintain*, establish, *or enforce* any policy or rule that has the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked *motor* vehicle, *or from transporting and storing firearms locked in or locked to a motor vehicle* on any property set aside for any motor vehicle.

OKLA. STAT. tit. 21, §§ 1289.7a and 1290.22.[61]   For purposes of this preemption analysis, the Amendments prevent Oklahoma employers from maintaining, establishing, or enforcing policies that disallow an employee to enter company property with a firearm locked in or locked to a motor vehicle.  The issue is whether this prohibition functions as a material impediment to an employer's obligations under the general duty clause or whether the prohibition thwarts overarching federal policy in a material way.  *See Mount Olivet Cemetery Ass'n*, 164 F.3d at 489.

Under the general duty clause, "every employer owes a duty of reasonable care to protect his employees from recognized hazards that are likely to cause death or serious bodily injury." *Teal*, 728 F.2d at 804.  A hazard is a "a condition that creates or contributes to an *increased risk* that an event causing death or serious bodily harm to employees will occur." *Baroid Div. of NL Ind.,* 660 F.2d at 444 (emphasis added).  Based on the statistics and authority set forth in detail above, the Court finds that gun-related workplace violence is a "hazard" that is likely to cause death or serious bodily injury to employees.  In addition, the Court finds the presence of unauthorized firearms on company property is also a "hazard" in the workplace because the presence of such firearms is

---

[60](...continued)
4, at note 48 & accompanying text.

[61] The italicized words represent the language added to § 1289.7a in 2005.

certainly a "condition that creates or contributes to an increased risk that an event causing death or serious bodily harm to employees will occur" on company property. *See id.*[62] OSHA has concluded and reported to employers that workplace violence is a "serious safety and health issue" in the American workplace. (*See* OSHA Website Materials, Ex. C to ConocoPhillips Add'l Br. on Preemption Issues.) A situation involving workplace violence, such as an altercation between employees or a domestic dispute that finds its way to company property, can escalate from a scuffle or an argument to a deadly gun fight in a matter of seconds based on the presence of firearms on company property. In fact, the Court can imagine no other "condition" on company property that more significantly increases the risk of death or serious bodily harm to employees in a situation involving workplace violence. Plaintiffs offer the following examples of how the "condition" of firearms in vehicles on their property decreases their ability to comply with the general duty clause:

> In the event of an armed confrontation at a workplace, going to a car to retrieve a firearm and then reentering the premises is certainly not a course of action that will reduce workplace violence or increase workplace safety. . . . There may be little practical way to differentiate between the law-abiding citizen carrying a firearm and the person initiating the armed confrontation, which adds to potential for panic in the workplace. Responding law enforcement personnel could also be unable to differentiate between the initial aggressor and the potential rescuer, with potentially tragic results.

(ConocoPhillips Add'l Br. on Preemption Issues 13 n.14.)

As explained in Part I.B of this Order, the types of firearms generally allowed under Oklahoma law extends to various types of loaded and unloaded firearms, including loaded handguns,

---

[62] In this regard, the Court accepts the arguments in the *amicus* brief submitted by the State Chamber. (*See* Br. of the Oklahoma State Chamber of Commerce as *Amicus Curiae* 4-5 ("Given the Guidelines issued by OSHA and the current workplace statistics, it is likely that OSHA would find workplace violence to constitute a recognized hazard . . . . Even more importantly, it seems clear OSHA would view a firearm at work as presenting a recognized hazard – a hazard which is likely to cause death or grievous bodily harm.").)

if the employee has a concealed weapons license.  Unlike other types of workplace equipment that may be dangerous only if misused, *e.g.*, without regard to safety instructions or without wearing proper equipment, one of the intended uses of a firearm is to inflict death or bodily harm.  In a situation involving workplace violence, the presence of an unauthorized firearm on company property immediately and significantly increases the risk that an employee will suffer death or serious harm.  The presence of these unauthorized firearms is precisely the type of "condition" that is likely to lead to death or serious harm and that employers must abate.

Although the Amendments only seek to force the allowance of firearms that are inside a locked vehicle, locked in a vehicle, or locked to a vehicle, *see* OKLA. STAT. tit. 21, §§ 1289.7a and 1290.22(B), these limitations have little substantive impact on the increased risk of death or harm caused by the presence of firearms at the workplace.  Plaintiffs and *amici* have represented that employees have free access to parking facilities and frequently visit those areas during working hours.  (*See, e.g.*, Aff. of James Snyder, Mot. for TRO and/or Prelim. Inj. Relief at Ex. B, ¶ 7) ("ConocoPhillips considers its parking lots an integral part of its workplace, as employees are frequently found in the parking lots during breaks and lunch periods.").)  Further, former Tulsa Police Chief Been testified:

> First, a vehicle, regardless of whether it is locked, is not a secure place to keep a firearm since it is not difficult for someone to break into a vehicle.  Second, allowing a firearm in a locked car on company property brings the firearm that much closer to the inside of the workplace and subjects employees and guests to the risk of violence.  Firearms, when present or readily accessible (such as just outside a building in an adjacent parking lot) are more likely to be used than when the firearms are not in close proximity.

(*See* Aff. of Dave Been, Ex. 2 to App. of Materials Submitted in Support of Plf.'s Mot. for TRO and/or Prelim. Inj., at ¶¶ 6-7.)  Based on this undisputed evidence, the Court concludes that locking

the firearms in or to vehicles does not prevent the dangerous workplace situations that the general duty clause seeks to prevent.  For example, locking the firearms in or to vehicles does not prevent an employee who brought the firearm to work from unlocking his car on a break, retrieving the weapon, and using the firearm to harm another employee either in the parking lot or inside the facility.  It does not prevent an employee from unlocking his car and allowing someone else to use the firearm to harm another employee.  Nor does it prevent a spouse or relative of an employee who has access to the locked vehicle from coming on to the property, retrieving the gun, and using it against the family member working at Plaintiffs' places of employment during a domestic dispute.  Although locking firearms in or to vehicles may prevent some accidental gun-related injuries, an employer's obligations under the general duty clause extend well beyond accidents.  Such obligations extend to intentional acts of workplace violence committed on company property.  *See, e.g.*, *Megawest Fin., Inc.*, OSHRC Docket No. 93-2879, 1995 OSAHRC Lexis 80 (May  8, 1995) (concluding that employer may be liable for such acts under certain circumstances).  The obligations exist even if the employer does not have the best opportunity to abate the hazard, s*ee Teal*, 728 F.2d at 804, *i.e.*, even if the employer is not aware that an employee is bringing firearms to work.  Thus, the Oklahoma Legislature's attempt to limit the danger of firearms on company property by restricting them to a locked vehicle simply does not alleviate the dangers the OSH Act seeks to prevent.

Having found the presence of two specific hazards, namely gun-related workplace violence and the presence of unauthorized firearms on company property, the Court further finds that the Amendments present a material impediment to the employer's ability to "abate" such hazards.  *See Baroid Div. of NL Ind.,* 660 F.2d at 444 (setting forth third element of liability under general duty clause as whether there "was a feasible method by which the cited employer could have abated the

'recognized hazard.'"").  OSHA has not enacted precise regulations to govern employers' methods of preventing gun-related injuries resulting from acts of workplace violence.  However, the general duty clause is treated as a specific regulation that governs all serious hazards not otherwise covered by the OSH Act, and it is a stand-alone obligation.  Thus, an employer is required to comply with the general duty clause by implementing policies and measures to prevent gun-related workplace violence.  *See* Standard Interpretations Letter, Oct. 23, 1996, *available at* www.osha.gov/SLTC/workplaceviolence/standards.html.  In this case, Plaintiffs have determined that firearms in employees' vehicles pose a risk to the health of their employees and, in a specific effort to comply with the general duty clause, enacted policies seeking to protect their employees from these dangers.  Such policies are, therefore, Plaintiffs' chosen methods of abating the two hazards of gun-related workplace violence and the presence of unauthorized firearms on company property.  For example, Intervening Plaintiff Norris' policy, which prohibits the "possession and/or use of any weapon, including handguns, on its premises," is directly tied to providing a safe working environment.  (Norris, DP, and Tulsa Winch's Mot. to Intervene as Add'l Plfs. at Ex. A.)  It provides: "Norris intends to provide a safe working environment for all employees. The prohibition of the use, distribution, or possession of weapons . . . on our property is one step in achieving that objective." (*Id.*; *see also* Br. of the Oklahoma State Chamber of Commerce as *Amicus Curiae* 4-5 (stating that "one of the most reasonable and effective ways to decrease the likelihood of [workplace violence] is for employers to prohibit employees from bringing weapons onto the employer's property").)

In addition to Plaintiffs' subjective opinions that their policies are effective methods of reducing reduce gun-related workplace injuries, there is published evidence that such policies are an effective method of reducing gun-related workplace injuries.  According to a study published in

2005 in the American Journal of Public Health, "workplaces where guns were specifically permitted were 5 to 7 times more likely to be the site of a worker homicide relative to those where all weapons were prohibited."  Dana Loomis, Stephen W. Marshall, and Myduc L. Ta, *Employer Policies Toward Guns and the Risk of Homicide in the Workplace*, 95 AM. J. OF PUB. HEALTH 830, 831 (2005).  In addition, former Chief Been testified:

> I am aware that many Oklahoma employers have a policy prohibiting firearms anywhere on company property.  In my opinion, an employer's policy prohibiting firearms anywhere on company property reduces the risk of workplace violence.  Such policies are part of an employer's legitimate workplace prevention plan.  The presence of firearms in a locked vehicle on an employer's parking lot increases the risk of workplace violence. . . . The Amendments will pose a higher likelihood of the use of firearms, and a corresponding greater risk of violence from them.

(*See* Aff. of Dave Been, Ex. 2 to App. of Materials Submitted in Support of Plf.'s Mot. for TRO and/or Prelim. Inj., at ¶¶ 5-7.)  Thus, Plaintiffs' chosen method of abating the hazards associated with unauthorized firearms on company property – eliminating unauthorized firearms from the entire premises – is a logical and effective means of complying with the general duty clause.  Notably, these policies are not overbroad or irrational attempts to comply with the OSH Act.  An employer is certainly less likely to be liable for an OSH Act violation if it prohibited the presence of the firearm used in an act of workplace violence than if it expressly consented to the presence of the firearm, as the Amendments require.  Jonathan A. Segal, *When Charles Manson Comes to the Workplace*, HR Magazine, June 1994 (recommending that, in order to avoid OSH Act and other liability, "[e]mployers should also have work rules that minimize the likelihood that employees will engage in violent behavior. . . . [*e.g.*,] every employer should prohibit employees from possessing, while at work, weapons, broadly defined."); *Business Owner Liability, supra,* at  646 ("If OSHA

recognizes workplace violence, then employers who prohibit weapons could be eliminating foreseeable hazards.").

In sum, the Amendments "materially impede" Plaintiffs' attempts to reduce workplace violence and comply with the general duty clause. *See Mount Olivet Cemetery Ass'n,* 164 F.3d at 489 (holding that, in order for obstacle preemption to apply, the state action must be a "material impediment" to the federal action).  This is because the Amendments criminally prohibit Plaintiffs' chosen method of abatement of these potential hazards and require employers to abolish their current firearms policies.  The Court can imagine no greater impediment than outright criminalization of the employer's attempt to comply with federal obligations and policies.  Accordingly, the Court finds the Amendments stand as a significant obstacle to compliance with the general duty clause and impair Plaintiffs' and all other Oklahoma employers' abilities to comply with their obligation to abate hazards that could lead to death or serious bodily harm in the workplace. *See Gonzalez*, 877 A.2d at 1253 (holding that common law products liability claim stood as an obstacle to accomplishment of federal regulation regarding forklift warning devices because the warnings urged by the plaintiff "actually may tend to create greater additional dangers in the workplace").

In addition to materially impeding employers' abilities to comply with the OSH Act general duty clause, the Amendments "thwart" the overarching federal policies of "encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards" and "stimulat[ing] employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions" *See* 29 U.S.C. § 651(b)(1).  The Amendments frustrate these overall goals by allowing an employee's desire to bring a firearm onto his employer's property to trump an employer's attempt to comply with its OSH Act obligations.  The specific frustration of federal purpose – a criminal statute prohibiting the employers from enacting a selected

method of abating the hazard of gun-related violence – is material because it strips employers of their ability to abate a well-documented hazard that is specifically addressed in OSHA's materials and on OSHA's website.  Consistent with its purpose, OSHA has effectively communicated to Plaintiffs the dangers of workplace violence and "stimulated" them to enact policies like Plaintiffs', which are designed to prevent gun-related workplace injuries.  The Amendments stymie this federal progress and thwart the federal objectives.

Further evidencing to what extent the Amendments thwart federal objectives under the OSH Act, § 1289.7a(B) of the OFA specifically impedes Congress' desire to hold employers accountable for injuries or deaths resulting from workplace hazards.  Section 1298.7a(B) purports to shield employers from civil liability for occurrences resulting from firearms that are allowed on private property pursuant to the Amendments.  This section provides:

> No person, property owner, tenant, employer, or business entity shall be liable in any civil action for occurrences which result from the storing of firearms in a locked motor vehicle on any property set aside for any motor vehicle, unless the person, property owner, tenant, employer, or owner of the business commits a criminal act involving the use of the firearms.  The provisions of this subsection shall not apply to claims pursuant to the Workers' Compensation Act.

OKLA. STAT. tit. 21, § 1289.7a(B).  Congress clearly intended to accomplish its goal of workplace safety by making employers accountable to the Secretary of Labor for workers' injuries or death caused by recognized hazards at the workplace.  *See* 29 U.S.C. § 654(a)(1).  Section 1289.7a(B) of the OFA stands as an obstacle to the accomplishment of this objective because it shields Oklahoma employers from OSH Act liability in the event of a gun-related injury occurring on employer property, even if the injury resulted from a recognized hazard that was capable of being abated.

Due to the serious obstacle posed by the Amendments to compliance with the general duty clause and the Amendments' frustration of the federal purpose of stimulating and encouraging

employers to enact policies promoting workplace safety, the Court finds this case wholly distinguishable from cases holding that a state law did not conflict with the OSH Act. *See, e.g., Lindsey v. Caterpillar, Inc.*, 480 F.3d 202, 212 (3rd Cir. 2007) ("No conflict exists in this case between the [federal] regulation and a private tort cause of action asserted on behalf of a worker who might have avoided a fatal accident had the protective device been in place . . . [because] 1) the [OSH] Act's clear legislative intent is the assurance of workers' safety and health; 2) the [state] regulation is one that excludes but does not forbid a protective device; and 3) the [state] agency recommends that workers be afforded that protective device); *N.J. Chamber of Commerce v. Hughey*, 868 F.2d 621, 628-30 (3rd Cir. 1989) (affirming district court's conclusion that state law requiring labeling of containers filled with hazardous materials did not conflict with OSH Act's labeling requirements because both could co-exist "without serious risk of one system obstructing or interfering with the other"); *Puffer's Hardware, Inc.*, 742 F.2d at 16 (holding that state regulation that exempted compliance with state elevator safety laws was not preempted by general duty clause because court "fail[ed] to see how this exemption from state regulations could act as an obstacle to the accomplishment of the purposes of the federal statute"); *In re Welding Fume Prod. Liab. Litig.*, 364 F. Supp. 2d at 697 (finding no conflict between federal "HazCom" standard and state common law duty to warn because "OSHA's requirement of an 'adequate warning' is entirely contiguous with the general duty imposed by the common law duty to warn others of known hazards"); *see generally* Richard C. Ausness, *The Welding Fume Case and the Preemptive Effect of OSHA's Hazcom Standard on Common Law Failure-to-Warn Claims*, 54 BUFF. L. REV. 103, 119-129 (2006) (setting forth comprehensive discussion of OSH Act preemption cases, none of which involved a state law that, in the employer's opinion, decreased workplace safety and hindered its ability to

comply with the OSH Act).[63]  In stark contrast to these cases, the Court finds undisputed evidence that the Amendments require employers to take an action that decreases workplace safety and makes it exceedingly more difficult to comply with their OSH Act obligations as set forth in the general duty clause and the overarching purposes.

This case demonstrates the need for and function of "obstacle conflict preemption" within a preemption analysis.  Even though there are not specific "standards" governing the prevention of workplace violence, the OSH Act requires employers to abate the hazard of gun-related workplace violence and comply with the general duty clause to the best of its ability.  The Amendments serve as a significant obstacle to Plaintiffs, who are attempting to comply with their OSH Act objectives and promote the OSH Act's goals.  The obstacle is in the form of a criminal sanction, rendering it impossible for Plaintiffs to utilize their chosen methods of reducing workplace hazards associated with firearms.  This tension between state law and federal law is simply untenable.  Even considering the presumption against federal preemption of a state law, *see Calif. v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989), the Court views this as a case in which the state regulation must give way to federal law because the state law impermissibly "conflicts" with the general duty clause and the accomplishment of the express congressional purposes set forth in the OSH Act.

## VI.    Conclusion

The Court has serious concerns about these criminal laws, which deprive Oklahoma property owners of the right to exclude those individuals carrying and transporting firearms in their vehicles. However, this Court's protection of Oklahoma citizens' property rights is limited by U.S. Supreme

---

[63]  In its Order for additional briefing on preemption, the Court directed the parties to many of these cases., which address the difficult interplay between the OSH Act and conflict preemption. (*See* 5/16/07 Order at 6.)  Unfortunately, the parties offered no helpful discussion of such cases.

Court decisions interpreting the Takings Clause and the Substantive Due Process Clause of the U.S. Constitution.  Under the current Supreme Court framework, the Amendments do not effect an unconstitutional taking of Plaintiffs' property without just compensation.  Nor do the Amendments effect an unconstitutional deprivation of a "fundamental right," as that term is used for purposes of a substantive due process analysis.  Therefore, the Amendments are subject only to rational basis review.  Although it is a close question, the Court cannot conclude the Amendments are wholly arbitrary or irrational methods of promoting safety and deterring crime.  It is not this Court's province to  invalidate state law because the Court disagrees with the Legislature's chosen method of achieving its objectives.

It is, however, this Court's province to determine if a state law impermissibly conflicts with federal law. The Court concludes the Amendments conflict with and are preempted by the OSH Act, which requires employers to abate hazards in their workplaces that could lead to death or serious bodily harm and which encourages employers to prevent gun-related workplace injuries.  The Amendments criminally prohibit an effective method of reducing gun-related workplace injuries and cannot coexist with federal obligations and objectives.  The Amendments are therefore enjoined to the extent they are preempted by the OSH Act.

Plaintiff ConocoPhillips Company's Motion and Brief in Support of Request for Permanent Injunctive and Declaratory Relief (Doc. 93) and Intervenors Norris, DP Manufacturing Inc., Tulsa Winch, Inc., Auto Crane Company and Ramsey Winch, Inc.'s Motion and Brief in Support of Request for Permanent Injunctive and Declaratory Relief (Doc. 94) are hereby GRANTED IN PART AND DENIED IN PART, and Defendants' Objections to Jurisdiction and Motion to Dismiss

Temporary Restraining Order (Docs. 91 and 92) are hereby DENIED.[64] Defendants, along with their agents and assigns, are permanently enjoined from enforcing OKLA. STAT. tit. 21, §§ 1289.7a and 1290.22(B) against Plaintiff ConocoPhillips, against all Intervening Plaintiffs, and against any other entity that is an "employer" as that term is defined in the OSH Act.[65]

**SO ORDERED this 4th day of OCTOBER, 2007.**

*[signature: Terence Kern]*

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

---

[64] The only arguments raised by Defendants in the currently pending motions to dismiss are (1) that the changes made to § 1289.7a of the OSDA in June of 2005 cure any vagueness problems raised by Plaintiffs, and (2) that the Amendments do not amount to an unconstitutional taking in light of the Supreme Court's decision in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980). (*See* Defs.' Obj. to Jurisdiction and Mot. to Dismiss TRO.)  The Court has addressed both arguments in ruling on Plaintiffs' motions for permanent injunction.

[65] "Employer" is defined under the OSH Act, as "a person engaged in a business affecting commerce who has employees, but does not include the United States or any State or political subdivision of a State."  29 U.S.C. § 652(5).